1

2

3

4

5

6

7

8                               **UNITED STATES DISTRICT COURT**

9                               **EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  FABIAN CABALLERO MARTINEZ, on behalf of himself and all others similarly situated, | )  Case No.: 1:19-cv-1581 JLT CDB |
| 12 | )  ORDER GRANTING PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT |
| 13                Plaintiff, | ) |
| 14       v. | )  ORDER GRANTING IN PART PLAINTIFF'S REQUESTS FOR ATTORNEYS' FEES AND A CLASS REPRESENTATIVE SERVICE PAYMENT |
| 15  SEMI-TROPIC COOPERATIVE GIN & ALMOND HULLER, INC. and DOES 1 through 20, inclusive, | ) |
| 16 | )  (Doc. 55) |
| 17                Defendants. | ) |

18

19         Fabian Caballero Martinez asserts Semi-Tropic Cooperative Gin & Almond Huller failed to

20  comply with wage and hour laws.  Plaintiff now seeks final approval of a settlement reached in this

21  action.  In addition, Plaintiff seeks attorneys' fees and costs from the settlement fund, costs for

22  settlement administration, and a service payment for the class representative.  (Doc. 55.)  Defendant

23  does not oppose these requests, and no class member submitted objections to the settlement terms.

24  The Court found the matters suitable for decision without oral arguments pursuant to Local Rule

25  230(g), and the hearing for final approval was vacated.  (Doc. 56.)

26         Because Plaintiff has met the burden to demonstrate certification of the Settlement Class is

27  appropriate under Rule 23 of the Federal Rules of Civil Procedure—and the terms of the settlement are

28  fair, reasonable, and adequate—the request for final approval of the Settlement is **GRANTED**.  The

request for attorney fees is **GRANTED** in the modified amount of **$120,000.00**; costs are awarded in the amount of **$10,537.33**; settlement administration costs are granted in the amount of **$5,000.00**; and Plaintiff's service award payment is **GRANTED** in the modified amount of **$2,500.00**.

## BACKGROUND

Plaintiff is a former, non-exempt employee of Defendant. (Doc. 16 at 4, ¶ 11.) Plaintiff reports that he performed "janitorial work and moving and sorting loads of almonds for shipment." (*Id*.) Plaintiff asserts that "Defendant's business runs twenty-four … hours a day processing almonds," and the nature of the job required "someone always be present to monitor the machines." (*Id*. at 7, ¶ 27.) He explains: "If the machines are left unattended while operating, trash and debris can damage the machines that process the almonds." (*Id*.) According to Plaintiff, "[f]or that reason, employees were required to show up early for their shifts to ensure that someone is always present to monitor the machines during shift changes." (*Id*.) Plaintiff contends his supervisor "also required that Plaintiff be at work early so that he can immediately replace the other employee." (*Id*.)

Plaintiff reports he "typically worked from Monday through Saturday," and "was scheduled to work from 6 PM to 6 AM." (Doc. 16 at 7, ¶ 28.) However, Plaintiff alleges he "had to clock in early and clock out late." (*Id*.) As a result, Plaintiff reports he arrived at work five to ten minutes before he was scheduled, and "[t]his time was never compensated." (*Id*.) In addition, he asserts he "had to occasionally remain at work up to 20 minutes after his shift had ended to allow his replacement to relieve him," and without compensation. (*Id*.) Plaintiff contends he also "is aware that other employees were required to do the same. (*Id*.) According to Plaintiff, his "wage statements reveal that he was paid for seventy-two … hours of work nearly every pay period, which suggests that Defendant was improperly rounding Plaintiff's time worked." (*Id*. at 7-8, ¶ 28.) He asserts that "[o]n at least one occasion," Defendant required Plaintiff to work seven days in a row, and Plaintiff "was not compensated at double his wage after the eighth hour of work." (*Id*. at 8, ¶ 28.)

Plaintiff alleges Defendant failed to provide uninterrupted meal periods and rest periods, "or pay a premium wage in lieu thereof." (Doc. 16 at 8, ¶¶ 29-30.) He contends he "did not receive his first meal period until 1 AM, more than seven … hours into his shift." (*Id*., ¶ 29.) Plaintiff asserts he "never received a second lunch period or signed a meal period waiver." (*Id*.) Plaintiff alleges that "he

2

was often interrupted and asked to perform work duties" during his rest and meal periods.  (*Id.*, ¶¶ 29-30.)  For example, Plaintiff asserts: "Supervisors and other employees would come into the break room and tell Plaintiff to work on a task that needed attention."  (*Id.*, ¶ 30.)  Plaintiff contends such practices "occurred every shift," and he "was never compensated with premium wages."  (*Id.*, ¶¶ 29-30.)

According to Plaintiff, "Defendant also failed to provide Class members, including Plaintiff, with accurate itemized wage statements."  (Doc. 16 at 8, ¶ 31.)  He asserts the wage statement did not "reflect[] all hours worked by Plaintiff" because he "was required to work before and after his shift had ended," and this time was not reflected on the wage statements.  (*Id.*)  Plaintiff contends Defendant failed "to itemize in wage statements all wages earned and accounting for the applicable rate of pay for Plaintiff and the members of the proposed class."  (*Id.* at 9, ¶ 34.)

Finally, Plaintiff asserts that upon his termination, Defendant "failed to compensate Plaintiff for all hours worked."  (Doc. 16 at 8, ¶ 32.)  He contends Defendant did not pay statutory penalties to class members, including Plaintiff.  (*Id.*)  Plaintiff alleges Defendant "made it difficult to account with precision for the unlawfully withheld wages due to Plaintiff and the Class … because Defendant did not fully implement and preserve a record keeping method to accurately record all hours worked and wages earned by its employees as required for non-exempt employees."  (*Id.* at 9, ¶ 35.)

On November 5, 2019, Plaintiff initiated this action by filing a complaint.  (Doc. 1.)  He filed a First Amended Complaint on January 30, 2020.  (Doc. 16.)  Plaintiff identified the following causes of action: (1) failure to pay overtime wages in violation of federal law; (2) failure to pay minimum wages; (3) failure to pay overtime wages under California law; (4) failure to furnish itemized wage statements; (5) meal period violations; (6) rest period violations; (7) failure to pay wages due upon termination or resignation; (8) violation of Cal. Bus. & Prof. Code § 17200, *et seq.*; and (9) civil penalties pursuant to California's Private Attorney General Act.  (Doc. 16 at 12-26.)  He asserted the claims were brought on behalf of himself and a class including: "All persons employed by Defendant … in the State of California at any time within four [] years of the filing of the Initial Complaint in this action."  (*Id.* at 9, ¶ 39.)  Defendant filed its First Amended Answer on March 5, 2020.  (Doc. 21.)

 The Court issued its Scheduling Order governing the action on April 14, 2020.  (Doc. 24.)  The parties engaged in discovery, including the production of "payroll and timekeeping records for the

1   Class." (Doc. 47-1 at 8.)  Plaintiff's counsel also hired an expert "to perform an extensive review and

2   analysis of these records and assembled a comprehensive damages model."  (Doc. 42-2 at 10.)

3       The parties participated in mediation with Steven M. Vartabedian on June 1, 2021.  (Doc. 47-1

4   at 8.)  "As a result of mediation, the parties reached an agreement in principal (sic) to settle this matter,

5   which they memorialized in a Memorandum of Understanding."  (Doc. 47-2 at 10, ¶ 20.)  The parties

6   later entered into the "Settlement Agreement and Release," which the parties and counsel executed

7   between January and March 2022.  (Doc. 42-3 at 2-26.)  Plaintiff submitted this agreement to the

8   LWDA on March 2, 2022.  (Doc. 55-2 at 15, Mallison Decl. ¶ 38.)

9       In June 2022, the parties executed the "Amended Settlement Agreement and Release" "to

10  conform with the applicable federal class certification requirements laid out in Rule 23," because the

11  original agreement referred to certification of the Settlement Class under state law.  (*See* Doc. 45 at 2;

12  *see also* Doc. 47-3.)  Plaintiff filed an unopposed motion for approval of the amended settlement.

13  (Doc. 47.)  On October 19, 2022, the Court granted preliminary approval.  (Doc. 50.)  The Court

14  appointed Fabian Caballero Martinez as Class Representative and authorized his request for an

15  incentive payment "up to the amount of $10,000, subject to a petition and review" when seeking final

16  approval.  (*Id.* at 30.)  The Court appointed the firm of Mallison & Martinez as Class Counsel, who

17  were authorized to seek "fees not to exceed 33 1/3% of the gross settlement amount and identified

18  costs," also subject to review at final approval stage.  (*Id.*)  Simpluris, Inc. was appointed the

19  Settlement Administrator, and authorized to seek up to $5,000 for administrative costs.  (*Id.*)

20      The Court also preliminarily approved a PAGA payment of $50,000 from the gross settlement,

21  including $37,500 to California's Labor and Workforce Development Agency with the remainder to be

22  paid to aggrieved employees.  (Doc. 50 at 24-26.)  However, the Court noted that only the initial

23  agreement was submitted to the LWDA and directed Plaintiff to submit the "Amended Settlement

24  Agreement and Release" to the LWDA within seven days of the date of service of the order granting

25  preliminary approval.  (*Id.* at 26, n.9; *id.* at 29, ¶ 4.)  Plaintiff submitted the amended agreement to the

26  LWDA on October 25, 2022.  (Doc. 59-2 at 2.)

27      On October 31, 2022, the Court approved the Class Notice.  (Doc. 54 at 1; *see also* Doc. 53-1.)

28  The Class Notice informed the Class Members of the nature of the action, the class definition

preliminarily approved by the Court, the issues to be resolved, claims released by participating class members, representation by counsel, deadlines for exclusion and objections, and the binding effect of a class judgment.  (*See* Doc. 53-1; Doc. 55-4 at 2-7.)

The Settlement Administrator reports Defendant provided data that identified 161 individuals as Class Members.  (Doc. 55-9 at 4, Reyes Decl. ¶ 6.)  On November 14, 2022, the Settlement Administrator mailed the Notice Packet—which included both the Class Notice and an "Election Not to Participate in the Settlement" form— to 153 Class Members, with addresses provided either by Defendant or the National Change of Address Database.  (*Id.*, ¶¶ 7-8.)  The Settlement Administrator reports that "[i]f a Class Member's Notice Packet was returned by the USPS as undeliverable and without a forwarding address, Simpluris performed an advanced address search (i.e. skip trace) on all of these addresses by using Accurint, a reputable research tool owned by Lexis-Nexis."  (*Id.*, ¶ 9.)  The Settlement Administrator reports updated addresses were located with skip tracing for 10 individuals and the Notice Packets were "promptly mailed … to those the updated addresses." (*Id.* at 4-5, ¶ 9)  The Settlement Administrator also received 10 returned Notice Packets with forwarding addresses and re-mailed the Notice Packets to the identified addresses.  (*Id.* at 5, ¶ 9.)  Only two of the mailed Notice Packets remained undeliverable.  (*Id.*)

The Settlement Administrator received one election to not participate in the Settlement, from Edgar Villela Lizorraga.  (Doc. 55-9 at 5, Reyes Decl. ¶ 13; *see also id.* at 19.)  No objections were received by either the Settlement Administrator or the Court.  (*See id* at 5, ¶ 14.)

Plaintiff filed the motion for final approval of the class settlement—including requests for all proposed payments from the gross settlement fund—on January 18, 2023.  (Doc. 55.)  He filed a Notice of Errata correcting evidence submitted with the motion on January 23, 2023.  (Doc. 57.)  The Court ordered supplemental briefing regarding service of the amended agreement upon the LWDA, to which Plaintiff responded on May 5, 2023.  (Docs. 58, 59.)

## SETTLEMENT TERMS

Pursuant to the "Amended Settlement Agreement and Release" ("the Settlement"), the parties agree to a gross settlement amount of $600,000.00 for the class defined as follows: "any individual who worked for Semi-Tropic in the State of California as an hourly paid, non-exempt employee at any time

between November 5, 2015 and June 3, 2021." (Doc. 55-3 at 2-4, Settlement §§ I.F, I.S.) In addition, the Settlement includes an "Escalator Clause," under which the gross settlement amount will be increased, pro rata, if the number of Class Members increases by more than 10% of the 155 members estimated at the time of execution. (*Id.* at 9, Settlement § III.A.4.) Defendant agrees to pay funds necessary to make the payments approved by the Court, including any share of employer-side payroll taxes, after final approval of the Settlement.[1] (*Id.* at 8, Settlement § III.A.)

**I.      Payment Terms**

The settlement fund will cover payments to class members, including an additional payment to Plaintiff as the Class Representative. (Doc. 55-3 at 9, Settlement § III.B.) In addition, the Settlement provides for payments to Class Counsel for attorneys' fees and costs, to the Settlement Administrator, and the California Labor & Workforce Development Agency, including the following:

- The Class Representative will receive a service payment up to $10,000;

- Class counsel will receive up to $200,000 for attorneys' fees, which equals 33 1/3 % of the gross settlement amount, and costs in an amount to be determined by the Court[2];

- The California Labor and Workforce Development Agency shall receive $37,500 from the total PAGA payment of $50,000; and

- The Settlement Administrator will receive up to $5,000 for fees and expenses.

(*Id.* at 9-11, Settlement § III.B.) After these payments, the remaining money ("Net Settlement Amount") will be distributed as settlement shares to class members. (*Id.* at 5, Settlement § I.V.) If the Court approves less than the amount requested for attorney's fees, costs, or payment to the LWDA, "the remainder will be retained in the Net Settlement Amount for distribution to Participating Class Members." (*Id.* at 10-11, Settlement §§ III.B.2, III.B.3.)

Class Members are not required to submit a claim to receive a share from the Net Settlement Amount. (*See* Doc. 55-3 at 11-12, Settlement § III.D.) Class Members' shares will be distributed on a

---

[1] Defendant agrees to pay the amount within ten days of the "Effective Date," which is seven days after the completion of several conditions and events, including "entry of a written final order by the Court approving [the] Settlement Agreement and entering final Judgement." (Doc. 55-3 at 3, Settlement § I.P.)

[2] Previously, Plaintiff's counsel reported the litigation expenses are "estimated not to exceed $11,000." (Doc. 47-1 at 9.)

pro rata basis, with shares "calculated by dividing the Net Settlement Amount by the total number of workweeks worked by each Class Member from November 5, 2015 to June 3, 2021." (Doc. 55-1 at 11-12, citing Settlement § III.D.1 [Doc. 55-3 at 11].)  In addition, "the amount allocated to the release of the PAGA claims … will only be distributed among those Class Members/ Allegedly Aggrieved Employees employed between June 25, 2018 and June 3, 2021." (*Id.* at 12.)  Thus, the exact amount Class Members receive depends upon how many weeks they worked for Defendant, and whether they are entitled to a portion allocated for the PAGA claims.  However, Plaintiff reports that if the Court were to approve of the proposed payments—including the maximum attorney fees and class representative service award under the Settlement—the average payment is estimated to be about $2,157 with 156 Class Members.  (*Id.*)

The entire Net Settlement Amount will be distributed, and if any checks are returned or are not cashed with 180 days, that money will not be returned to Defendant.  (Doc. 55-3 at 12, Settlement § III.D.5.)  Instead, the uncashed funds will be distributed to a *cy pres* beneficiary approved by the Court. (*Id.* at 19, Settlement § III.E.5.)

**II.     Releases**

The Settlement provides that Plaintiff and class members, other than those who elect not to participate in the Settlement, shall release Semi-Tropic[3] from claims arising in the class period. Specifically, the release for class members provides:

> Upon the Effective Date, each and every Participating Class Member, on behalf him/herself and on behalf of his/her respective current, former and future heirs, spouses, executors, administrators, agents, and attorneys, fully and finally releases and discharges Semi-Tropic and the Released Parties from all of the Released Claims, as defined in this Settlement Agreement.

(Doc. 55-3 at 20, Settlement § III.G.1, emphasis omitted.)  "Released Claims" are defined as:

> [A]ll claims asserted in the Lawsuit and any and all claims, suits, actions, debts, liabilities, demands, obligations, penalties, guarantees, costs, expenses, attorney's fees, damages, debts, losses, controversies, setoffs, counterclaims, or causes of action of any kind or nature or description whatsoever in law, equity, statutory or otherwise, whether known or unknown, contingent or accrued, including, but not limited to, any claim which was asserted or could have been asserted at common law or under

---

[3] The Settlement also indicates the release encompasses Defendant's "present and former parent companies, subsidiaries, affiliated corporations and entities, and all of their agents, shareholders, officers, directors, members, managers, employees, representatives, insurers, successors, attorneys, fiduciaries, and assigns." (Doc. 55-3 at 6, Settlement § I.CC.)

any statute, rule, regulation, order or law, whether federal, state or local, arising from, or related to, the facts, claims, and/or circumstances alleged in the Lawsuit or Plaintiff's PAGA notice letter, or which were alleged or which could have been alleged against the Released Parties based on the facts or claims alleged in the Lawsuit or Plaintiff's PAGA notice letter, including, but not limited to, for or regarding the payment of wages; unpaid wages; unpaid minimum wages; unpaid overtime compensation; interest or penalties for unpaid wages, unpaid minimum wages, or unpaid overtime compensation; off-the-clock work; failure to timely pay wages owed; failure to provide meal periods or to pay premium pay in lieu thereof; failure to provide rest breaks or to pay premium pay in lieu thereof; failure to provide and maintain accurate and itemized wage statements; inaccurate, incomplete or incorrect pay instruments/stubs and/or wage or earnings statements; inaccurate payroll or time record-keeping records; failure to reimburse business expenses; waiting time penalties; damages; premium pay; breach of contract or company policy; statutory penalties; civil penalties; injunctive relief; declaratory relief; restitution; interest; costs and attorneys' fees; enforcement of the California Labor Code Private Attorney General Act of 2004, Labor Code §§ 2698, *et seq.*; fraudulent business practices or unfair competition under the California Business and Professions Code §§ 17200, *et seq.*; and any other claims or damages arising out of or relating to Plaintiff's and/ or any Class Members' employment with Semi-Tropic during the period of time from November 5, 2015 to the date of Preliminary Approval of the Settlement, whether known or unknown.

(Doc. 55-3 at 5-6, Settlement § I.BB, emphasis omitted.)

The release for Plaintiff encompasses more claims than the Class Members, because he agreed to release *any* claims that may have arisen during his employment with Semi-Tropic, not just those claims constrained to the facts alleged in this lawsuit.  Specifically, Plaintiff's release provides:

As of the Effective Date, and in consideration of his Settlement Share, and the other terms and conditions of the Settlement Agreement, Plaintiff, on behalf of himself and his current, former and future heirs, executors, administrators, executors, spouses, agents, and attorneys, hereby fully and finally releases and discharges Semi- Tropic and the Released Parties from all of the Released Claims and any and all claims, rights, demands, liabilities, obligations, penalties, costs, expenses, attorneys' fees, rights, damages, suits, indemnities, controversies, setoffs, debts, losses, counterclaims, guarantees, actions and causes of action of any kind, nature or description whatsoever in law, equity statutory, administrative, or otherwise, or any other monetary or non-monetary relief, that any of them had, now have, or may have in the future, including, but not limited to, any arising in any way from Plaintiff's employment with Semi-Tropic or the cessation thereof, whether such claims are known or unknown, suspected or unsuspected, arising on or before the Effective Date of this Agreement (unless a release of claims is excluded by law).

(Doc. 55-3 at 20, Settlement § III.G.3, emphasis omitted.)  Thus, claims released by Plaintiff—but not the Settlement Class—include any claims arising under the Americans with Disabilities Act, Title VII

1    of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the Employee Retirement Income Security Act.

2    Indeed, the Settlement indicates: "Plaintiff intends that this Agreement be, and is, a general release that

3    shall be affective as a bar to any and all claims against the Released Parties." (*Id.* at 21, § III.G.4.)

4    **III.    Service of the Notice Packets and Responses Received**

5          The "Notice of Class Action Settlement and Your Rights" (the "Notice") explained to Class

6    Members they do not need to "take any action" to receive a settlement share. (Doc. 55-4 at 5; Doc. 55-

7    9 at 10.) Class Members were also provided with a form entitled "Election Not to Participate in

8    Settlement," to request exclusion form the Class. (Doc. 55-9 at 12.) Together, the Notice and exclusion

9    form completed the "Notice Packet" served upon Class Members. (Doc. 55-9 at 4, Reyes Decl. ¶ 5.)

10          Evelin Reyes, a case manager for the Settlement Administrator, reports Defendant provided

11    data for Class Members, including "names, most recent mailing address and telephone numbers, social

12    security numbers, and pertinent employment information for each Class Member during the Class

13    Period" on November 3, 2022. (Doc. 55-9 at 4, Reyes Decl. ¶ 6.) The Settlement Administrator then

14    processed the mailing addresses and updated contact information with the "National Change of

15    Address Database ('NCOA') maintained by the U.S. Postal Service." (*Id.*, ¶ 7.) Ms. Reyes reports the

16    Notice Packet—in both English and Spanish—was mailed to 153 Class Members, who were informed

17    any objections or requests for exclusion were required to be postmarked no later than December 27,

18    2022. (*Id.*, ¶ 8; *see also* Doc. 55-9 at 10-11, 12.)

19          Ms. Reyes reports that one "Election not to Participate in the Settlement" form was received

20    from Edgar Villela Lizorraga. (Doc. 55-9 at 5, Reyes Decl. ¶ 13; *see also id.* at 19.) This individual

21    will not receive shares from the Settlement and is excluded from the Settlement Class. Ms. Reyes

22    reports the Settlement Administrator did not receive any objections to the Settlement terms. (*Id.*, ¶ 14.)

23    Likewise, the Court did not receive any objections to the Settlement.

24                  **APPROVAL OF A CLASS SETTLEMENT**

25          When parties settle the action prior to class certification, the Court has an obligation to "peruse

26    the proposed compromise to ratify both the propriety of the certification and the fairness of the

27    settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). Approval of a class settlement is

28    generally a two-step process. First, the Court must assess whether a class exists. *Id.* (citing *Amchem*

1    *Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)).  Second, the Court must "determine whether the

2    proposed settlement is fundamentally fair, adequate, and reasonable."  *Id.* (citing *Hanlon v. Chrysler*

3    *Corp.*, 150 F.3d 1011, 1026 (9th Cir. 2998)).  The decision to approve or reject a settlement is within

4    the Court's discretion.  *Hanlon*, 150 F.3d at 1026.

5    **I.      Certification of a Settlement Class[4]**

6              Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure, which

7    provides that "[o]ne or more members of a class may sue or be sued as representative parties on behalf

8    of all."  Fed. R. Civ. P. 23(a).  Parties seeking class certification bear the burden of demonstrating the

9    elements of Rule 23(a) are satisfied, and "must affirmatively demonstrate … compliance with the

10   Rule."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Doninger v. Pacific Northwest Bell,*

11   *Inc.*, 563 F.2d 1304, 1308 (9th Cir. 1977).  If an action meets the prerequisites of Rule 23(a), the Court

12   must consider whether the class is maintainable under one or more of the three alternatives set forth in

13   Rule 23(b).  *Narouz v. Charter Communs., LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010).

14             The proposed Settlement Class includes: "any individual who worked for Semi-Tropic in the

15   State of California as an hourly paid, non-exempt employee at any time between November 5, 2015 and

16   June 3, 2021."  (Doc. 55-3 at 2, Settlement § I.F.)  Plaintiff contends the Settlement Class should be

17   certified because "[e]very requirement of Rule 23 is satisfied."  (Doc. 55-1 at 19.)

18             **A.      Rule 23(a) Requirements**

19             The prerequisites of Rule 23(a) "effectively limit the class claims to those fairly encompassed

20   by the named plaintiff's claims."  *General Telephone Co. of the Southwest. v. Falcon*, 457 U.S. 147,

21   155-56 (1982).  Certification of a class is proper if:

22                      (1) the class is so numerous that joinder of all members is impracticable;
                       (2) there are questions of law or fact common to the class; (3) the claims
23                      or defenses of the representative parties are typical of the claims or
                       defenses of the class; and (4) the representative parties will fairly and
24                      adequately protect the interests of the class.

25   Fed. R. Civ. P. 23(a). These prerequisites are generally referred to as numerosity, commonality,

26   typicality, and adequacy of representation.  *Falcon*, 457 U.S. at 156.

27

28   _____
     [4] Because the proposed class was only conditionally certified upon preliminary approval of the Settlement, final
     certification of the Settlement Class is required.

### 1.      Numerosity

This prerequisite requires the Court to consider "specific facts of each case and imposes no absolute limitations." *General Telephone Co. v. EEOC*, 446 U.S. 318, 330 (1980).  Although there is not a specific threshold, joining more than one hundred plaintiffs is impracticable.  *See Immigrant Assistance Project of Los Angeles Cnt. Fed'n of Labor v. INS*, 306 F.3d 842, 869 (9th Cir. 2002); *see also Gay v. Waiters' & Dairy Lunchmen's Union*, 549 F.2d 1330, 1332 n.7 (9th Cir. 1977) (finding a proposed class with 110 members met the numerosity requirement).  Plaintiff reports there 152 Class Members.  (Doc. 55-1 at 19, citing Reyes Decl. ¶ 10 [Doc. 55-9 at 5].)  Therefore, joinder of all identified class members as plaintiffs is impracticable, and the numerosity requirement is satisfied.

### 2.      Commonality

Rule 23(a) requires "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2). To satisfy the commonality requirement, the plaintiff must demonstrate common points of facts and law.  *See Wal-Mart Stores*, 564 U.S. at 350.  Thus, "commonality requires that the class members' claims depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke," and the "plaintiff must demonstrate the capacity of classwide proceedings to generate common answers to common questions of law or fact that are apt to drive the resolution of the litigation."  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks, citations omitted).

Plaintiff asserts the commonality requirement is satisfied based upon "an illegal rounding policy, failure to record time spent working off the clock, rest and meal period violations, and unlawful wage statements."  (Doc. 55-1 at 20; *see also* Doc. 47-1 at 21.)  Plaintiff contends "these policies and practices were committed against the Class uniformly." (Doc. 47-1 at 21.)  Because it appears resolution of the issues—such whether Defendant's policies violated California wage and hour law— would apply to the claims of each of the Class Members, the Court finds the commonality requirement is satisfied for purposes of settlement.

### 3.      Typicality

This requirement demands that the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  A claim or defense is not required to

be identical, but rather "reasonably coextensive" with those of the absent class members.  *Hanlon*, 150 F.3d at 1020.  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotation marks, citation omitted); *see also Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995) (the typicality requirement is satisfied when named plaintiffs have the same claims as other members of the class and are not subject to unique defenses).

Plaintiff contends he "suffered similar injuries" as Class Members.  (Doc. 55-1 at 20.)  Plaintiff reports he performed "janitorial work and moving and sorting loads of almonds for shipment" for Defendant and was classified as a non-exempt employee.  (Doc. 16 at 4, ¶ 11.)  He also reports that "employees were required to show up early for their shifts to ensure that someone is always present to monitor the machines during shift changes."  (*Id.* at 7, ¶ 27.)  Plaintiff asserts he remained at work "up to 20 minutes after his shift ended to allow his replacement to relieve him," and he was "aware that other employees were required to do the same.  (*Id.*, ¶ 28.)  He alleges Defendant improperly rounded the time worked and did not provide compensation for this time.  (*Id.*)  In addition, Plaintiff contends Defendant "failed to provide Class members, including Plaintiff, with accurate itemized wage statements," because the time employees were required to be present before and after scheduled shifts was not reflected in the wage statements.  (*Id.* at 8, ¶ 31.)

According to Plaintiff, his "claims are essentially identical to all other non-exempt workers in Defendant's almond hulling plant."  (Doc. 47-1 at 21.)  Because Plaintiff reports he was subjected to the same company policies and payment procedures as Settlement Class Members, it appears he would also be a member of the class even if not the representative.  Indeed, Class Counsel reports that "[t]he firm chose the class representative as a characteristic member of the class."  (Doc. 55-2 at 9, Mallison Decl. ¶ 16.)  Therefore, the Court finds the typicality requirement is satisfied for purposes of settlement. *See Hanon*, 976 F.2d at 508; *Kayes*, 51 F.3d at 1463.

### 4.     Fair and Adequate Representation

Absentee class members must be adequately represented for judgment to be binding upon them.  *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940).  Accordingly, this prerequisite is satisfied if the

representative party "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "[R]esolution of this issue requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000) (citing *Hanlon*, 150 F.3d at 1020).

### a.   Class representative

Plaintiff was appointed as the class representative for the Settlement Class. (Doc. 50 at 30.) Stan Mallison, counsel for Plaintiff and the Class, reports "there is no known conflict" between Plaintiff and the Class. (Doc. 55-2 at 16, Mallison Decl. ¶ 40.) Mr. Mallison states that Plaintiff "carried out all required tasks in this case to help [counsel] pursue this action, providing us with information, documents, insights, opinions, and necessary decisions to make this case successful." (*Id.* at 9, ¶ 16.) Plaintiff also reports that he: "(a) engaged in numerous periodic conferences with counsel; (b) participated in the litigation and provided input into the case; (c) was kept fully informed regarding the status of the case; and (d) provided significant input respecting litigation and settlement strategy." (Doc. 55-8 at 3, Caballero Decl. ¶ 5.) Moreover, the interests of Plaintiff are aligned with those of the class members: to maximize their recovery. Thus, it appears Plaintiff has fairly and adequately represented the interests of the Settlement Class.

### b.   Class counsel

The Court appointed the law firm of Mallison & Martinez as Class Counsel. (Doc. 50 at 30.) Mr. Mallison reports the firm "is primarily engaged in employment law class and representative actions on behalf of mostly Spanish-speaking agricultural, janitorial, automotive, and restaurant employees." (Doc. 55-2 at 2, ¶ 4.) No conflicts were identified by either Plaintiff or Defendant between Class Counsel and Class Members. Mr. Mallison asserts: "The only relationship with Plaintiff in this current litigation is an attorney-client relationship." (Doc. 55-2 at 9, ¶ 16.) In addition, Mr. Mallison identified 26 "past and present cases" in which the firm has served as Class Counsel or co-lead Counsel. (*Id.* at 3-5, ¶ 6.) The described litigation experience supports a conclusion that Class Counsel prosecuted the action vigorously on behalf of the Settlement Class. Therefore, Class Counsel have satisfied the adequacy requirements.

**B.     Certification of a Class under Rule 23(b)(3)**

For the foregoing reasons, the prerequisites of Rule 23(a) are satisfied by the Settlement Class. However, the class may only be certified if it is maintainable under Rule 23(b).  Fed. R. Civ. P. 23(b); *see also Narouz*, 591 F.3d at 1266.  Plaintiff asserts certification of the settlement class is appropriate under Rule 23(b)(3).  (Doc. 55-1 at 20-22.)

Under Rule 239(b)(3), a class is maintainable if (1) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and (2) "a class action is superior to other available methods for fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  These are referred to as the "predominance" and "superiority" requirements.  *See Hanlon*, 150 F.3d at 1022-23; *see also Wal-Mart Stores*, 564 U.S. at 363 ("(b)(3) requires the judge to make findings about predominance and superiority before allowing the class").

### 1.     Predominance

The predominance inquiry focuses on "the relationship between the common and individual issues" and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Hanlon*, 150 F.3d at 1022 (citing *Amchem Prods.*, 521 U.S. at 623).  "[A] central concern of the Rule 23(b)(3) predominance test is whether 'adjudication of common issues will help achieve judicial economy.'"  *Vinole v. Countrywide Home Loans,* 571 F.3d 935, 944 (9th Cir. 2009) (quoting *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1189 (9th Cir. 2001)).

Plaintiff contends the predominance requirement is satisfied because "the issues of Plaintiff's allegations create common issues that predominate over individual questions."  (Doc. 55-1 at 21.) Importantly, Plaintiff asserts all Class Members were subject to the same policies and practices.  (*See* Doc. 55-1 at 20; *see also* Doc. 47-1 at 21.)   Based upon the information provided and allegations presented in the First Amended Complaint, the Court finds adjudication of the claims via a class action promotes judicial economy and this requirement is satisfied.

### 2.     Superiority

The superiority inquiry requires a determination of "whether objectives of the particular class action procedure will be achieved in the particular case."  *Hanlon*, 150 F.3d at 1023 (citation omitted). This tests whether "class litigation of common issues will reduce litigation costs and promote greater

1   efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).  Pursuant to Rule

2   23(b)(3), the Court must consider four non-exclusive factors to determine whether a class is a superior

3   method of adjudication, including (1) interests of class members, (2) other pending litigation, (3) the

4   desirability of concentrating claims in one forum, and (4) difficulties with the management of the class

5   action.  *Id.; see also James v. Uber Techs. Inc.*, 338 F.R.D. 123, 143 (C.D. Cal. 2021) (indicating the

6   factors identified in Rule 12(b)(3) address the "superiority" analysis).

7                              a.      *Class members' interest in individual litigation*

8           The Court is directed to consider "the class members' interests in individually controlling the

9   prosecution or defense of separate actions."  Fed. R. Civ. P. 23(b)(3)(A).  This factor is most relevant

10  when the class members "suffered sizeable damages or [have] an emotional stake in the litigation."

11  *McKenzie v. Fed. Express Corp.*, 275 F.R.D. 290, 301 (C.D. Cal. 2011).  The Ninth Circuit explained

12  that "[w]here damages suffered by each putative class member are not large, this factor weighs in

13  favor of certifying a class action."  *Zinser*, 253 F.3d at 1190.

14          The Settlement Administrator reports only one "Election to not Participate" was received, and

15  no objections to the terms were submitted.  (Doc. 55-9 at 5, Reyes Decl. ¶¶ 13-14.)  Thus, there is no

16  indication the remaining Class Members have any desire to control the prosecution of this action or

17  proceed with individual litigation.  Furthermore, the anticipated payments to Class Members are not

18  particularly large, as the estimated average payment is $2,203.95.  (*Id.*, ¶ 12.)  It is unlikely that

19  individuals would pursue such claims.  *See Zinser*, 253 F.3d at 1190; *Thieriot v. Celtic Ins.*, 2011 WL

20  1522385, at *4 (N.D. Cal. Apr. 21, 2011) (the average payment of $2,462 supported a finding that the

21  class action was superior to individual cases); *Millan v. Cascade Water Servs., Inc.,* 310 F.R.D. 593,

22  606 (E.D. Cal. 2015) (the average estimated recovery of about $7,300 for overtime and meal break

23  claims supported a conclusion that a class action was superior to individual litigation, because it was

24  "unlikely that such a sum would drive interest in controlling the prosecution of a separate action").  As

25  this Court previously observed: "When the individual claims of class members are small, the class

26  action facilitates the spreading of the litigation costs among the numerous injured parties."

27  *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 451 (E.D. Cal. 2013) (internal quotation marks,

28  citation omitted).  Therefore, the factor weighs in favor of certification.

15

1

*b.      Other litigation*

2       Next, the Court considers "the extent and nature of any litigation concerning the controversy

3   already begun by or against class members."  Fed. R. Civ. P. 23(b)(3)(B).  Plaintiff reports this is

4   "[t]he only known litigation" regarding the claims in issue.  (Doc. 55-1 at 20.)  Because the parties did

5   not identify any other litigation related to the claims alleged or encompassed in this Settlement, this

6   factor weighs in favor of class certification.

7

*c.      Concentration in one forum*

8       Third, the Court must consider "the desirability or undesirability of concentrating the litigation

9   of the claims in the particular forum."  Fed. R. Civ. P. 23(b)(3)(C).  There is no suggestion the Eastern

10  District is an undesirable forum for the matter, which raises wage and hour claims under California

11  law on behalf of employees throughout the state.  *See United States ex rel. Terry v. Wasatch*

12  *Advantage Grp., LLC*, 327 F.R.D. 395, 419 (E.D. Cal. 2018) (finding the factor weighed in favor of

13  certification where the proposed class was compromised of individuals located in California and

14  involved "California state law claims").  Moreover, as this Court previously explained, when "parties

15  … agreed on a proposed Settlement Agreement, the desirability of concentrating the litigation in one

16  forum is obvious."  *Wright v. Linkus Enters.*, 259 F.R.D. 468, 474 (E.D. Cal. 2009) (internal quotation

17  marks, citation omitted).  Therefore, this factor weighs in favor of certification.

18

*d.      Management of the action*

19      Finally, the Court must consider "the likely difficulties in managing a class action."  Fed. R.

20  Civ. P. 23(b)(3)(D).  The Supreme Court explained that, in general, "manageability … encompasses

21  the whole range of practical problems that may render the class format inappropriate for a particular

22  suit."  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).  Because the parties reached an

23  agreement for the class claims and identified the Settlement Class, it does not appear there are any

24  problems with managing the action.  *See Espinosa v. Ahearn*, 926 F.3d 539, 556-57 (9th Cir. 2019)

25  ("manageability is not a concern in certifying a settlement class where, by definition, there will be no

26  trial"); *see also Spann v. J.C. Penney Corp.*, 214 F.R.D. 312, 318 (C.D. Cal. 2016) ("settlement

27  obviates the need for a manageable trial").  Further, the Court need not speculate as to manageability if

28  the case were to proceed to trial.  *See Amchem Prods.*, 521 521 U.S. at 620 ("with a request for

16

settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems").  Consequently, this factor weighs in favor of certification.

## II.    Evaluation of the Settlement Terms

Settlement of a class action requires approval of the Court, which may be granted "only after a hearing and on finding that [the settlement] is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Approval is required to ensure settlement is consistent with the plaintiff's fiduciary obligations to the class.  *See Ficalora v. Lockheed Cal. Co.*, 751 F.2d 995, 996 (9th Cir. 1985).  Toward that end, "Congress and the Supreme Court amended Rule 23(e) to set forth specific factors to consider in determining whether a settlement is 'fair, reasonable, and adequate.'" *Briseño v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021); *see* Fed. R. Civ. P. 23(e)(2) (effective Dec. 1, 2018).  Rule 23(e)(2) now directs the Court to consider whether:

> (A) the class representatives and class counsel have adequately represented
>     the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
>     (i) the costs, risks, and delay of trial and appeal;
>     (ii) the effectiveness of any proposed method of distributing relief to
>     the class, including the method of processing class-member claims;
>     (iii) the terms of any proposed award of attorney's fees, including
>     timing of payment; and
>     (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2); *see also Briseño*, 998 F.3d at 1023-24.  The Ninth Circuit determined this revision to Rule 23 requires courts "to go beyond [its] precedent." *Briseño*, 998 F.3d at 1026.[5]

---

[5] Previously, the Ninth Circuit identified several factors to determine whether a settlement agreement is "fair, reasonable, and adequate," including:

> the strength of plaintiff's case; the risk, expense, complexity, and likely duration of further
> litigation; the risk of maintaining class action status throughout the trial; the amount offered in
> settlement; the extent of discovery completed, and the stage of the proceedings; the
> experience and views of counsel; the presence of a governmental participant; and the reaction
> of the class members to the proposed settlement.

*Staton*, 327 F.3d at 959 (citation omitted).  Although Plaintiff refers to the factors under the Ninth Circuit precedent (Doc. 55-1 at 17-19), the Court focuses its analysis on the factors enumerated in Rule 23.  *See Briseño*, 998 F.3d at 1026; *Kim v. Allison*, 8 F.4th 1170, 1178-79 (9th Cir. 2021) (explaining the failure to address the factors identified under the amended Rule 23 will not survive appellate review); *see also Herrera v. Wells Fargo Bank, N.A.*, 2021 U.S. Dist. LEXIS 170195, at *21 (C.D. Cal. June 8, 2021) ("The goal of [amended Rule 23(e)] is … to focus the [district] court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal" [quoting Fed. R. Civ. P. 23(e)(2), 2018 Advisory Committee Notes]).

### A.   Representation of the Class

To determine adequacy of representation under Rule 23(e)(2), the Court may consider whether the interests of the named plaintiff are "aligned with the interests of the Class Members."  *See Cottle v. Plaid Inc.*, 240 F.R.D. 356, 376 (N.D. Cal. 2021).  A finding that "Class Counsel are experienced and competent" supports a conclusion that the class is adequately represented.  *Id.; see also In re Pac. Enters. Sec. Litig.,* 47 F.3d 373, 378 (9th Cir. 1995) ("Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation.").  Thus, the adequacy analysis under Rule 23(e)(2) is "redundant of the requirements of Rule 23(a)(4) and Rule 23(g), respectively."  *Mandalevy v. Bofi Holding, Inc.*, 2022 WL 1556160, at *6 (S.D. Cal. May 17, 2022) (quoting 4 William B. Rubenstein, Newberg on Class Actions § 13:48 (5th ed. 2020)).

Plaintiff's interests appear aligned with those of class members, as they share a common interest in challenging the alleged wrongful wage and hour policies.  In addition, the founding partners at Mallison & Martinez are clearly experienced in class action litigation.  (*See* Doc. 55-2 at 7-9, Mallison Decl. ¶¶ 8-14.)  Because Plaintiff carried the burden to show the adequacy prerequisite was satisfied under Rule 23(a), the Court finds the requirement under Rule 23(e)(2) is also satisfied.  *See Flores v. Dart Container Corp.*, 2021 WL 1985440, at *5 (E.D. Cal. May 17, 2021) ("Because the Court has found that the proposed class satisfies Rule 23(a)(4) for purposes of class certification, the adequacy factor under Rule 23(e)(2)(A) is also met").

### B.   Negotiation of the Settlement

Under Rule 23, the Court must consider whether "the proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B).  The Ninth Circuit also "put[s] a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution" in evaluating a proposed class action settlement. *Rodriguez v. W. Publ'g Corp*., 563 F.3d 948, 967 (9th Cir. 2009).  The inquiry of collusion addresses the possibility that the settlement agreement is the result of either "overt misconduct by the negotiators" or improper incentives of class members at the expense of others.  *Staton*, 327 F.3d at 960.  The Ninth Circuit observed that "settlement class actions present unique due process concerns for absent class members" because the "inherent risk is that class counsel may collude with the defendants, tacitly

1  reducing the overall settlement in return for a higher attorney's fee." *See In re Bluetooth Headset*

2  *Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (internal quotation marks, citations omitted).

3  Thus, the Court must consider whether the process by which the parties arrived at their settlement is

4  truly the product of arm's length bargaining—as Plaintiff asserts (Doc. 55-1 at 16)— or the product of

5  collusion or fraud. *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 613 (E.D. Cal. 2015).

6          In particular, when a class action settlement agreement is reached prior to certification of a

7  class, district courts must be watchful "not only for explicit collusion, but also for more subtle signs

8  that class counsel have allowed pursuit of their own self-interests and that of certain class members to

9  infect the negotiations." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 94; *see also Briseño*,

10 998 F.3d at 1023.  The Ninth Circuit indicated the "more subtle signs" of collusion include: (1) "when

11 counsel receive a disproportionate distribution of the settlement, or when the class receives no

12 monetary distribution but class counsel are amply rewarded"; (2) the existence of a "clear sailing"

13 arrangement, which provides "for the payment of attorneys' fees separate and apart from class funds"

14 and "carries the potential of enabling a defendant to pay class counsel excessive fees and costs in

15 exchange for counsel accepting an unfair settlement on behalf of the class"; and (3) "when the parties

16 arrange for fees not awarded to revert to defendants rather than be added to the class fund."  *Id.*

17 (internal quotations, citations omitted).

18                    1.       Whether there is a disproportionate distribution to counsel

19         The Settlement provides that Class Counsel may request attorneys' fees up to $200,000, which

20 is one third of the gross settlement fund.  (Doc. 55-3 at 9, Settlement § III.B.2.)  The typical range of

21 acceptable attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with

22 25% considered the benchmark.  *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000).  Because the

23 fees requested are within the range awarded by the Ninth Circuit from the gross settlement fund, the

24 Court finds the Settlement Agreement does not provide a disproportionate distribution to Class

25 Counsel.  *See Millan v. Casvade Water Servs.*, 310 F.R.D. 593, 612 (E.D. Cal. 2015) (finding no

26 disproportionate distribution where class counsel was to receive a third of the settlement fund "although

27 significantly above the benchmark for this Circuit," because it was "not unreasonable as an upper

28 bound" of fees awarded in the Circuit).

2.     Existence of a "clear sailing" agreement

In general, a "clear sailing" provision is one in which the parties agree to the "payment of attorneys' fees separate and apart from class funds." *In re Bluetooth Headset Prods.,* 654 F.3d at 947. However, the Ninth Circuit recognized also a "clear sailing" arrangement exists when a defendant expressly agrees not to oppose an award of attorneys' fees up to an agreed upon amount. *Lane*, 696 F.3d at 832; *In re Bluetooth Headset Prods.*, 654 F.3d at 947.

Defendant agreed the company "will not oppose Class Counsel's application to the Court for an award of not more than 33 1/3% of the Goss Settlement Amount as their Class Counsel Fees Payment, plus an additional mount for reasonable costs." (Doc. 55-3 at 9, Settlement § III.B.2.)  Thus, the Settlement includes a version of a "clear sailing agreement."  Nevertheless, the existence of a clear sailing provision is not necessarily fatal to approval.  *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 948; *see also In re Toys R Us-Delaware, Inc.–Fair and Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 458 (C.D. Cal. 2014) ("a clear sailing agreement is one where the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling").  Rather, "when confronted with a clear sailing provision, the district court has a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class." *Id.* (citing *Staton*, 327 F.3d at 954).

As discussed below, the Court finds an award from the common fund is appropriate, and the modified award is reasonable in light of the time expended and results obtained.  This factor does not mandate a finding of collusion and the factor does not weigh against final approval of the settlement. *See Swain v. Anders Group, LLC*, 2023 WL 2976368, at *10 (E.D. Cal. Apr. 17, 2023) (finding a clear sailing provision did not weigh against final approval where the fees were "reasonable based on evidence submitted by class counsel"); *see also Singh v. Roadrunner Intermodal Servs. LLC*, 2019 WL 316814 at *7-8 (E.D. Cal. Jan 24, 2019) (not finding collusion between the parties, despite a clear sailing agreement, where the fee award was analyzed and determined to be reasonable).

3.     Whether there is a reversion to Defendant

Finally, the parties did not arrange for any unawarded fees to revert to Defendant.  Instead, the parties acknowledge in the Settlement Agreement that the Court may approve less than the requested

amount of fees, in which case the Net Settlement Amount will be adjusted.  (Doc. 47-3 at 9, Settlement § III.B.2) Because unawarded fees will be retained in the Net Settlement Amount for distribution to participating class members, this factor does not support a finding of collusion between the parties.

### 4.     Findings on collusion

Based upon the factors set forth by the Ninth Circuit, the Court finds the proposed settlement "appears to be the product of serious, informed, non-collusive negotiations."  *See In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079-80 (N.D. Cal. 2007).  Thus, this factor under Rule 23 supports final approval of the class settlement.

### C.     Relief Provided to the Class

The Ninth Circuit observed "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'"  *Officers for Justice v. Civil Serv. Commission*, 688 F.2d 615, 624 (9th Cir. 1982) (citation omitted).  When analyzing an agreement, the Court should examine "the complete package taken as a whole," and the proposed settlement is "not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators." *Officers for Justice*, 688 F.2d at 625, 628.

Class Counsel performed a damages assessment "based on a statistical analysis of Class Members' pay and timekeeping records."  (Doc. 55-2 at 14, Mallison Decl. ¶ 34.)  Mr. Mallison notes the "analysis was performed in advance of mediation for the purpose of showing Defendant the 'worst case scenario' should the Class prevail on all its claims at trial."  (*Id.*)  Mr. Mallison reports:

> Plaintiff estimated the damages for unpaid wages (i.e., based on off-the-clock and time rounding) to be approximately $154,846, exclusive of interest. As these instances of unpaid time were relatively short, and the damages from rounding modest, the penalties for meal and rest break violations form the bulk of Defendant's exposure. Plaintiff estimated the damages for meal and rest break violations to be $160,350 and $70,491, respectively (exclusive of interest). However, recovery for rest break violations was questionable, given the expected difficulties of certifying a rest break class without time records (as employees need not record paid rest break time). Lastly, Plaintiff estimated Defendant's liability for waiting time penalties under Labor Code section 203 to be $1,841,648, and for wage statement penalties under Section 226 to be $33,766.

(*Id.* at 14-15, ¶ 35.)  With these calculations, Defendant's possible exposure for damages and statutory penalties totaled $2,261,101.  (*Id.* at 15, ¶ 35.)  Thus, the gross settlement fund of $600,000 represents

1   approximately 26 percent of the maximum possible recovery calculated by Class Counsel.

2          Notably, the Ninth Circuit observed: "It is well-settled law that a cash settlement amounting to

3   only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *In*

4   *re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 459.  The recovery in this action is consistent with other

5   approved settlements.  *See, e.g., Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D 443, 444 (E.D. Cal.

6   2013) (finding the recovery of approximately 30% was "a reasonable compromise" and supported

7   approval of the class settlement); *Milburn v. Petsmart, Inc.*, 2019 WL 1746056, at *9 (E.D. Cal. Apr.

8   17, 2019) (approving a settlement that "represent[ed] approximately 25 percent of plaintiff's maximum

9   possible recovery," and noting that "district courts in California have found similar percentage

10  recoveries to be reasonable"); *Millan v. Cascade Water Servs., Inc.*, 2016 WL 3077710, at *7 (E.D.

11  Cal. May 31, 2016) (granting final approval of a settlement that was "approximately one-quarter of the

12  predicted maximum recovery amount"); *Gonzalez v. Corecivic of Tenn., LLC*, 2018 WL 4388425, at *6

13  (E.D. Cal. Sept. 12, 2018) (approving a settlement where the recovery was "approximately 20 percent

14  of the case's total potential value").  Thus, the percentage recovered on behalf of the class members

15  does not weigh against approval of the Settlement.

16         After the anticipated maximum deductions from the gross settlement fund, the Settlement

17  Administrator reports that $347,500.00 will be dispersed to Class Members.  (Doc. 55-9 at 5, Reyes

18  Decl. ¶¶ 11-12.)  The Settlement Administrator estimates the average payment for Class Members is

19  $2,203.95 and the highest payment will be $17,748.75.  (*Id.* at 5, ¶ 12.)  Analyzing the factors identified

20  in Rule 23—as discussed below—the Court finds the amount offered and relief provided to the

21  Settlement Class supports final approval of the Settlement.

22                      1.      Costs, risks, and delays

23         A "central concern" evaluating a proposed class settlement "relate[s] to the cost and risk

24  involved in pursuing a litigated outcome."  *Feltzs v. Cox Comm's Cal., LLC*, 2022 WL 2079144 at *9

25  (C.D. Cal. Mar. 2, 2022), quoting Fed. R. Civ. P. 23(e), 2018 Advisory Committee Notes [modification

26  in original].)  Approval of settlement is "preferable to lengthy and expensive litigation with uncertain

27  results."  *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004).  If

28  the settlement were to be rejected, the parties would have to engage in further litigation, including

seeking class certification and discovery on the issue of damages.

The parties agree the claims are "highly disputed." (Doc. 55-3 at 7, Settlement § II.F.) Defendant indicates it "has taken into account the uncertainty and risks inherent in any litigation and has also concluded that further defense of the Lawsuit would be protracted and expensive." (*Id.*) Similarly, Plaintiff reports that counsel "carefully considered the risks of trial and other normal perils of litigation, including the merits of the affirmative defenses asserted by Defendant, the difficulties of complex litigation, the lengthy process of establishing specific damages, new legal decisions affecting pivotal issues in the case[6], and other various possible risks and delays." (Doc. 55-1 at 7, citing Mallison Decl. ¶¶ 32-37 [Doc. 55-2 at 13-15].) Previously, Plaintiff acknowledged that even if he prevailed upon the "wage and break violation claims," there are "legal obstacles in obtaining other damages and penalties derivative thereof." (Doc. 47-1 at 15.) For example, Plaintiff observed:

> [T]he possibility existed that the Court would decline to enter a finding of "willfulness" with regard to Defendant's untimely payment of wages to severed employees, thus foreclosing on any recovery under Labor Code section 203. Similarly, the Court may have declined to find that there was any "injury" to Class Members resulting from allegedly inaccurate wage statements. *See* Cal. Lab. Code § 226(e)(1).

(*Id.*) In addition, Plaintiff contends the Settlement "provides a certainty of recovery," while "further litigation or trial of the matter would substantially delay any compensation to Class Members and/or potentially imperil the financial stability of Defendants, and their ability to provide any remedies in this action." (Doc. 55-1 at 9.)

Employment law class actions are, by their nature, time-consuming and expensive to litigate. *Hightower v. JPMorgan Chase Bank, N.A.*, 2015 WL 9664959 at *6 (C.D. Cal. Aug. 4, 2015). If the Settlement is rejected, the parties would have to engage in further litigation, including seeking class certification and discovery on the issue of damages. The time and expense of continued litigation could outweigh any additional recovery. On the other hand, the proposed settlement provides for immediate

---

[6] Mr. Mallison asserts, "until the *Naranjo* matter is decided by the California Supreme Court … I recognized that Plaintiff's meal break claim might not readily support awards of wage statement and waiting time violations." (Doc. 55-2 at 14, ¶ 13.) Thus, it appears Class Counsel refers to the California Supreme Court's review in *Naranjo v. Spectrum Security Services, Inc.*, 40 Cal. App. 5th 444 (2019), *review granted*, 257 Cal. Rptr. 3d 188 (Jan. 2, 2020), which was pending when Plaintiff first moved for preliminary approval of the initial settlement. However, the California Supreme Court issued its decision in *Naranjo* on May 23, 2022. *Id.*, 13 Cal. 5th 93 (2022). Counsel did not provide any information concerning the extent to which, if at all, the decision impacted the merits of Plaintiff's claims.

recovery on claims presented by Plaintiff on behalf of the class.  Due to the acknowledged risk of the claims of class members, costs of future litigation that may reduce the recovery to class members, and delay in payments if the settlement is not approved, this factor weighs in favor of final approval of the Settlement.  *See Rodriguez*, 563 F.3d at 966 (risk, expense, complexity and duration of litigation supports settlement); *Curtis-Bauer v. Morgan Stanley & Co., Inc*., 2008 WL 4667090, at *4 (N.D. Cal. Oct. 22, 2008) ("Settlement avoids the complexity, delay, risk and expense of continuing with the litigation and will produce a prompt, certain, and substantial recovery for the Plaintiff class.").

### 2.     Method of distribution

"[T]he goal of any distribution method is to get as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible." *Hilsley v. Ocean Spray Cranberries, Inc.*, 2020 WL 520616 at *7 (S.D. Cal. Jan. 31, 2020) (citing "Final approval criteria—Rule 23(e)(2)(C)(ii): Distribution method," 4 Newberg on Class Actions § 13:53 (5th ed.)). "Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims." Fed. R. Civ. P. 23(e), 2018 Advisory Committee Notes. "A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." *Id*.

### a.     *Distribution to class members*

Class Members are not required to submit a claim form to receive their settlement share.  (*See* Doc. 55-3 at 5, Settlement § I.Y [indicating a "Participating Class Member" is an individual "who does not submit a valid and timely Election Not to Participate in Settlement"]; *see also* Doc. 55-9 at 10 [informing Class Members they "need not take any action … to receive [a] Settlement Share," and checks would "automatically be mailed" by the Settlement Administrator].)  Rather, Class Members only needed to take specific action to opt-out of the settlement, object to any of the terms, or dispute the number of workweeks identified to calculate their individual settlement share.  Because submission of a claim form is not required, the proposed distribution method is not "unduly demanding" upon Class Members and will facilitate payment for legitimate claims.  Thus, this factor supports final approval of the Settlement.  *See Jackson v. Fastenal Co.*, 2021 WL 5755583 at *11 (E.D. Cal. Dec. 3, 2021) (finding "the proposed method of distributing relief is effective, and weighs

24

in favor of a finding that the settlement agreement is fair, reasonable and adequate" where the class members did not have to file a claim).

b.       Distribution to a cy pres beneficiary

Since many class settlements result in unclaimed funds, the parties should have a plan for distribution of the unclaimed funds. *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990).  Options for such distribution include cy pres distribution, escheat to the government, and reversion to the defendants.  *Id.*, 904 F.2d at 1307.  Here, the parties agree that a cy pres beneficiary should be designated for uncashed or returned funds under the Settlement and indicate the recipient should be "Legal Aid at Work or some similar organization as approved by the Court." (Doc. 55-3 at 19, Settlement § III.E.5.)

The Ninth Circuit determined a proposed cy pres recipient should be "tethered to the nature of the lawsuit and the interest of the silent class members." *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1039 (9th Cir. 2011).  In other words, the Ninth Circuit "require[s] that there be a driving nexus between the plaintiff class and the cy pres beneficiaries." *Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th Cir. 2012) (citing *Nachshin*, 663 F.3d at 1038).  The Court explained that without such tethering, the distribution of funds "may create the appearance of impropriety" by catering "to the whims and self interests of the parties, their counsel, or the court." *Nachshin*, 663 F.3d at 1038.  Thus, a cy pres award should not benefit a group that is "too remote from the plaintiff class." *Six Mexican Workers*, 904 F.2d at 1308.

In identifying a cy pres beneficiary, the Ninth Circuit directs courts to consider whether awards to the beneficiary "(1) address the objectives of the underlying statutes, (2) target the plaintiff class, or (3) provide reasonable certainty that any member will be benefitted." *See Nachshin*, 663 F.3d at 1039-1040 (citing *Six Mexican Workers*, 904 F.2d at 1307).  Further, the Court must consider whether the cy pres distribution is appropriate given the "size and geographic diversity" of the class members.  *Id.* at 1040-1041 (citing, e.g., *In re Airline Ticket Comm'n Antitrust Litig.*, 307 F.3d 679, 683 (8th Cir. 2002); *Houck on Behalf of U.S. v. Folding Carton Admin. Comm.*, 881 F.2d 494, 502 (7th Cir. 1989)).

At the preliminary approval stage, the Court observed that Plaintiff did not provide "any analysis" of the factors identified by the Ninth Circuit "to assist the Court in evaluating whether Legal Aid at Work is an appropriate cy pres beneficiary." (Doc. 50 at 8.)  The Court observed:

> Mr. Mallison reports only that "Legal Aid at Work is a 501(c)(3) non-profit organization which assists indigent workers with employment law claims." (Doc. 47-2 at 12, ¶ 27.) However, there is no evidence before the Court that class members are "indigent" and qualify for the assistance of Legal Aid at Work. Similarly, there is no information provided regarding the location of the organization, such that the Court may determine any member of the class lives in the same community and could benefit from its assistance. *See Nachshin*, 663 F.3d at 1040 (giving significant weight to the geographic scope of the settlement class). Indeed, a cursory review demonstrates that in many cases in which Mr. Mallison or Mr. Martinez were counsel of record, class counsel recommended the cy pres beneficiary be a pro bono law firm. *Rosales v. El Rancho Farms*, 2015 WL 4460635, at *9 (E.D. Cal. July 21, 2015), report and recommendation adopted, No. 1:09-CV-00707AWI JLT, 2015 WL 13659310 (E.D. Cal. Oct. 2, 2015); *Ontiveros v. Zamora*, 2014 WL 3057506, at *1 (E.D. Cal. July 7, 2014), Doc. 123-3 at 8-10; *Sandoval Ortega v. Aho Enterprises, Inc.*, 2021 WL 5584761, at *13 (N.D. Cal. Nov. 30, 2021); *Sandoval v. M1 Auto Collisions Centers*, 2017 WL 11679905, at *5 (N.D. Cal. Mar. 20, 2017). This suggests that pro bono law firms represent the interests of counsel, rather than the class. Moreover, both Mr. Mallison and Mr. Martinez worked for CRLA, which was the recipient of the cy pes funds in many [of] the cases cited here.

(*Id.* at 8-9, n.5.) In addition, the Court observed that "growing numbers of courts… strongly question the wisdom of cy pres beneficiaries." (*Id.* at 9, n.5, emphasis omitted.) Accordingly, the Court preliminarily found "**the proposed cy pres beneficiary is not appropriate**." (*Id.*, emphasis in original.) The Court ordered: "Plaintiff **SHALL** clearly address the factors identified by the Ninth Circuit in *Nachshin* in seeking final approval of the Settlement." (*Id.*)

In response to the Court's order, Mr. Mallison reports that "Legal Aid at Work is a 501(c)(3) is a non-profit organization which assists low-income workers with employment law matters throughout California, including: Fresno, Watsonville, San Francisco, East Palo Alto, Los Angeles, Santa Ana, San Diego, Sacramento, Berkeley/Oakland, Antioch, San Bernardino, and Ontario." (Doc. 55-2 at 12, Mallison Decl. ¶ 27.) According to Mr. Mallison, "Legal [A]id has formed clinics and helplines which provides low-income and unemployed individuals with free information about their legal rights related to work performed in California." (*Id.*) He observes Legal Aid provides "services in Spanish and many other languages." (*Id.*) Mr. Mallison contends: "Distribution of any uncashed checks will thus benefit California low-income workers in need of legal advice relating to employment disputes, which is precisely the type of claims brought by Plaintiff and the class in the instant suit." (*Id.* at 12-13, ¶ 27.) Therefore, Mr. Mallison believes that "the work performed by Legal Aid addresses the objectives of the

26

underlying action and is connected to the members of the class." (*Id.* at 13, ¶ 27.)  Plaintiff also provided a copy of Legal Aid at Work's 2020 Financial Statement to support appointment of the organization as the cy pres beneficiary.[7]  (*Id.*; *see also* Doc. 55-5.)

As the Court previously observed, there is no evidence that Class Members are indigent or low-income individuals.  Thus, it is questionable whether distribution to Legal Aid at Work would benefit the Settlement Class.  There also is no evidence that Class Members reside in cities where Legal Aid at Work offers assistance.  In the First Amended Complaint, Plaintiff indicated the case was "properly assigned to the Bakersfield Division of this Court because the action arose in Kern County, California." (Doc. 16 at 4, ¶ 10.)  Plaintiff reported that he "was employed by Defendant within Kern County, California." (*Id.*, ¶ 11.)  Plaintiff also reported that "[a]t all times relevant, Semi-Tropic conducted and conducts business in Kern County." (*Id.* at 6, ¶ 22.)  There is no evidence that Defendant conducted business in a location outside of Kern County.  To the contrary, the limited information before the Court strongly suggests that Class Members also worked, or currently work, for Defendant in Kern County.  Given the wide geographic area serviced by Legal Aid at Work—without any identified offices in Kern County—it appears extremely unlikely that any funds would benefit any of the 152 members of the Settlement Class.  The Court is unable to find that Legal Aid at Work is "tethered to the nature of the lawsuit and the interest of the silent class members." *See Nachshin*, 663 F.3d at 1039.  Therefore, the Court **DECLINES** to appoint Legal Aid at Work as the cy pres beneficiary.

Nevertheless, the Ninth Circuit observed that issues related to the identity of a cy pres beneficiary are not generally ripe until funds remain unclaimed.  *See Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009) (finding cy pres distribution "becomes ripe only if entire settlement fund is not distributed to class members" and declining to determine propriety of cy pres distribution at that time).  The Court explained that where a cy pres distribution is contingent on the outcome of the claims process for a cash distribution, issues regarding the identification of recipients "will not be ripe until it is determined that available cash remains in th[e] fund after the claims process has concluded."

---

[7] Class Counsel did not identify any specific information in the financial statement to assist the Court in its evaluation of Legal Aid at Work as a cy pres beneficiary.  The Court declines to speculate as to the significance of the evidence.

1    *Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th Cir. 2012).  At this point in the proceedings, it is

2    impossible to predict whether funds will remain for distribution to a cy pres beneficiary.  The Court

3    will retain jurisdiction over the Settlement, and the parties may seek approval of an appropriate cy pres

4    beneficiary if the issue becomes ripe.  Accordingly, the proposed distribution to a cy pres beneficiary

5    does not weigh against final approval.  *See Hartless v. Clorox Co.*, 273 F.R.D. 630, 642 (S.D. Cal.

6    2011) (finding the cy pres recipient need not be identified prior to granting final approval, because the

7    issue was not ripe).

8                   3.      Attorneys' fees

9         Under Rule 23, "courts must scrutinize 'the terms of any proposed award of attorney's fees.'"

10    *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 607 (9th Cir. 2021) (quoting Fed. R. Civ. P.

11    23(e)(2)(C)(iii).  The Ninth Circuit explained, "the new Rule 23(e) makes clear that courts must balance

12    the 'proposed award of attorney's fees' vis-à-vis the 'relief provided for the class' in determining

13    whether the settlement is 'adequate' for class members."  *Id.*, quoting *Briseño*, 998 F.3d at 1024.

14         The fees to which the parties have agreed fall within the range of acceptable attorneys' fees in

15    the Ninth Circuit.  *See Powers*, 229 F.3d at 1256.  Further, the Court finds the modified fees to be

16    awarded are fair, adequate, and reasonable.  The Court-approved payment shall be made by the

17    Settlement Administrator "out of the Gross Settlement Amount promptly upon receipt." (Doc. 55-3 at

18    9, Settlement § III.B.2.)  Notably, the Settlement Administrator shall pay approved payments to Class

19    Members within 15 business days of the Effective Date.  (*Id.* at 11, Settlement § III.D.)  Although it

20    appears Class Counsel will receive payment prior to the Class Members, the gap between payments

21    does not appear so significant as to weigh against approval of the Class Settlement.  *See Perks v.*

22    *ActiveHours, Inc.*, 2021 WL 1146038, at *6 (N.D. Cal. Mar. 25, 2021) (finding the timing did not

23    weigh against approval where both class counsel and class members were to receive payments after

24    final approval).  The amount of fees and the timing of the payment to Class Counsel do not weigh

25    against final approval of the Class Settlement.

26                   4.      Agreement required to be identified

27         The Court must consider any agreement that is required to be identified under Rule 23(e)(3).

28    Fed. R. Civ. P. 23(e)(2)(C)(iv).  Specifically, "parties seeking approval must file a statement

identifying any agreement made in connection with the proposal." Fed. R. Civ. P. 23(e)(3). The parties have not identified any agreement, and the Court is unaware of any such agreement.  Thus, this factor does not weigh against final approval.

### D.        Treatment of Class Members

Rule 23 requires the Court to consider whether the proposed settlement "treats class members equitably relative to each other."  Fed. R. Civ. P. 23(e)(2)(D).  "A distribution of relief that favors some class members at the expense of others may be a red flag that class counsel have sold out some of the class members at the expense of others, or for their own benefit."  *Hilsley*, 2020 WL 520616 at *7 (citation omitted).

The parties agreed that Class Members who did not request exclusion from the Settlement will receive a *pro rata* share of the Net Settlement Amount, "calculated by dividing the Net Settlement Amount by the total number of workweeks worked by each class member during the Class Period." (Doc. 55-3 at 11, Settlement § III.D.1.)  The Class Member Payment will also include any "Aggrieved Employee" payment under Cal. Lab. Code § 2699(c).  (*Id.*)  Because the Settlement provides a *pro rata* distribution to Class Members based upon their workweeks, the agreement treats Class Members equitably.  *See Cooks v. TNG GP*, 2021 WL 5139613 at *4 (E.D. Cal. Nov. 4, 2021) (a calculation of payments to class members "on a pro-rata basis based on the number of compensable workweeks each member worked … is fair and treats class members equitably"); *see also Martinelli v. Johnson & Johnson*, 2022 WL 4123874, at *6 (E.D. Cal. Sept. 8, 2022) ("the pro rata distribution set forth in the Settlement Agreement [is] equitable"). Therefore, the distribution plan supports final approval.

### E.        Views of Counsel

As addressed above, Class Counsel are experienced in class action litigation.  Mr. Mallison indicates a belief that "the Amended Settlement is fair, adequate, and reasonable, as it provides substantial compensation to employees who worked for Defendant."  (Doc. 55-2 at 11, Mallison Decl. ¶ 22.)  The Settlement also provides: "The Parties and their respective counsel believe and warrant that this Settlement Agreement reflects a fair, reasonable, and adequate settlement of the Lawsuit."  (Doc. 55-3 at 22, § III.I.7.)  These opinions of counsel are entitled to significant weight and support approval of the Settlement.  *See Nat'l Rural Telecomms.*, 221 F.R.D. at 528 ("Great weight is accorded to the

1  recommendation of counsel, who are most closely acquainted with the facts of the underlying

2  litigation"); *Barbosa v. Cargill Meat Solutions Corp*., 297 F.R.D. 431, 447 (E.D. Cal. 2013) ("the trial

3  court is entitled to, and should, rely upon the judgment of experienced counsel for the parties.").

4      **F.**    **Reaction of Class Members to the Proposed Settlement**

5      "[T]he absence of a large number of objections to a proposed class action settlement raises a

6  strong presumption that the terms of a proposed class action settlement are favorable to the class

7  members." *Nat'l Rural Telecomms.*, 221 F.R.D. at 529; *see also Cottle*, 340 F.R.D. at 376 (observing

8  the court may assess the reaction of class members by considering "how many class members

9  submitted … objections" at the final approval stage).

10      Plaintiff has agreed to the terms of Settlement Agreement.  (*See* Doc. 55-3 at 24; Doc. 55-8 at 4,

11  Caballero Decl. ¶ 4.)  After receiving the Court-approved Notice Packet, no objections were made to

12  the Settlement, and only one individual requested exclusion by submitting the "Election Not to

13  Participate" form.  (Doc. 55-9 at 5, ¶¶ 13-14.)  Thus, a significant majority of Class Members reacted

14  favorably to the proposed settlement terms by not requesting exclusion or submitting objections, and

15  this factor weighs in favor of final approval.  *See Chun-Hoon v. McKee Foods Corp.,* 716 F. Supp. 2d

16  848, 852 (N.D. Cal. 2010) (finding the class members' reaction was "overwhelming[ly] positive"

17  where 16 out of 329 individuals—a total of approximately 4.86% of the class— opted out of the

18  settlement); *see also Thomas v. Cognizant Tech. Sols. U.S. Corp.*, 2013 WL 12371622, at *7 (C.D. Cal.

19  June 24, 2013) ("the lack of objections and only one request for exclusion evinces a positive reaction

20  by the Class Members to the proposed settlement.").

21                   **APPROVAL OF PAGA SETTLEMENT**

22      California adopted its Private Attorney General Act "to supplement enforcement actions by

23  public agencies, which lack adequate resources to bring all such actions themselves." *Arias v. Superior*

24  *Court*, 46 Cal. 4th 969, 986 (2009).  PAGA allows individual plaintiffs "to bring a civil action to

25  collect civil penalties for Labor Code violations previously only available in enforcement actions

26  initiated by the State's labor law enforcement agencies."  *Caliber Bodyworks, Inc. v. Superior Court*,

27  134 Cal. App. 4th 365, 374 (2005); *see also* Cal. Lab. Code § 2699(a); *Urbino v. Orkin Servs. of Cal.,*

28

*Inc.*, 726 F.3d 1118, 1121 (9th Cir. 2013).  Thus, a PAGA plaintiff acts "as the proxy or agent of the state's labor law enforcement agencies." *Arias*, 46 Cal. 4th at 986.

Pursuant to PAGA, an "aggrieved employee" may bring an action for civil penalties for labor code violations on behalf of himself and other current or former employees.  Cal. Lab. Code § 2699(a). PAGA defines an "aggrieved employee" as "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed."  *Id*.  A judgment in a PAGA action "binds all those, including nonparty aggrieved employees, who would be bound by a judgment in an action brought by the government." *Arias*, 46 Cal. 4th at 986.

To bring an action under PAGA, an aggrieved employee must first provide written notice to the employer and the Labor and Work Force Development Agency.  Cal. Lab. Code § 2699.3(a)(1). Recovery under PAGA is limited to civil penalties, and the civil penalties must be allocated with 75% directed to the LWDA and 25% to aggrieved employees.  *Id.* § 2699(i).  Any proposed settlement of PAGA claims must be submitted to the LWDA, and a trial court must "review and approve" any settlement of PAGA claims.  *Id.* § 2699(l)(2); *see also Haralson v. U.S. Aviation Servs. Corp*., 383 F. Supp. 3d 959, 971 (N.D. Cal. 2019) (because settling a PAGA claim "compromises a claim that could otherwise be brought be the state," it requires that a court "review and approve any settlement of any civil action pursuant to [PAGA]") (citation omitted).

Although there is no binding authority establishing the standard of review for PAGA settlements, California district courts "have applied a Rule 23-like standard, asking whether the settlement of the PAGA claims is 'fundamentally fair, adequate, and reasonable in light of PAGA's policies and purposes.'" *Haralson*, 383 F. Supp. 3d at 972.  This standard is derived principally from the LWDA itself.  *See O'Connor v. Uber Techs., Inc*., 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016). The LWDA indicated:

> It is thus important that when a PAGA claim is settled, the relief provided for under the PAGA be genuine and meaningful, consistent with the underlying purpose of the statute to benefit the public and, in the context of a class action, the court evaluate whether the settlement meets the standards of being "fundamentally fair, reasonable, and adequate" with reference to the public policies underlying the PAGA.

*Id.* (citation omitted).  When a proposed settlement involves overlapping class action and PAGA

claims, courts may employ a "sliding scale" to determine if the proposed settlement is "fundamentally fair, reasonable, and adequate with reference to the public policies underlying the PAGA." *O'Connor*, 201 F. Supp. 3d at 1134; *see also Haralson*, 383 F. Supp. 3d at 972 (following *O'Connor*); *Cooks*, 2020 WL 5535397 at *9-10 (same).  "[W]here the settlement for the rule 23 class is robust, the purposes of PAGA may be concurrently fulfilled."  *Cooks*, 2020 WL 5535397 at *10 (quoting *O'Connor*, 201 F. Supp. 3d at 1134).

Stan Mallison reports that "Plaintiff submitted the initial Settlement Agreement to the LWDA on March 2, 2022."  (Doc. 55-2 at 15, Mallison Decl. ¶ 38.)  In addition, Plaintiff submitted the amended Settlement Agreement to the LWDA on October 25, 2022.  (Doc 59-2 at 2.)  Plaintiff reports the LWDA did not make any comments upon the Settlement. (Doc. 59-1 at 2, Quezada Decl. ¶ 3.)  The fact that the LWDA has not commented upon—or objected to—the Settlement supports final approval. *See Mostajo v. Nationwide Mut. Ins. Co.*, 2023 WL 2918657, at *8 (E.D. Cal. Apr. 12, 2023) (noting the LWDA did not respond to the submission of the proposed settlement prior to granting final approval of the PAGA settlement); *Moreno v. Capital Bldg. Maint. & Cleaning Servs.*, 2021 WL 1788447, at *8 (N.D. Cal. May 5, 2021) ("The lack of comment from the LWDA weighs in favor of finding that the PAGA settlement is reasonable.").

The settlement fund of $600,000 appears sufficiently robust—with more than $330,000 going to the class members—such that the Court finds the purposes of PAGA to address the alleged labor violations are fulfilled by the proposed agreement.  Under the Settlement Agreement, $50,000 of the Gross Settlement Amount is designated as the PAGA payment.  (Doc. 55-3 at 10, Settlement § III.B.3.) The Settlement properly designates 75% of the PAGA funds to the LWDA—in the amount of $37,500 from the Gross Settlement Amount—and the remaining $12,500 to the aggrieved employees.  (*Id.*) Accordingly, the Court finds approval of the PAGA payment is also appropriate.  *See Mostajo*, 2023 WL 2918657, at *7-8 (finding a $50,000 payment from the gross settlement fund for PAGA claims was fair and adequate, even where it was only 1.3% of the gross fund).

### **REQUEST FOR ATTORNEYS' FEES**

Pursuant to the Settlement, Class Counsel may request fees in the amount of one third of the settlement fund, or $200,000.  (Doc. 55-3 at 9, Settlement § III.B.2.)  Class Counsel contend "the

circumstances of this case support a 33 1/3% fee award."  (Doc. 55-1 at 23, emphasis omitted.)

Defendant agreed to not oppose this fee request.  (Doc. 55-3 at 9, Settlement § III.B.2.)

## I.      Legal Standards

"[A] district court must carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement." *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003).  Thus, a court "may not uncritically accept a fee request," but must review the time billed and assess whether it is reasonable in light of the work performed and the context of the case.  *Common Cause v. Jones*, 235 F. Supp. 2d 1076, 1079 (C.D. Cal. 2002); *see also McGrath v. County of Nevada*, 67 F.3d 248, 254 n.5 (9th Cir. 1995) (a court may not adopt representations regarding the reasonableness of time expended without independent review); *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1385 (9th Cir. 1984) (remanding an action for a thorough inquiry on the fee request when "the district court engaged in the 'regrettable practice' of adopting the findings drafted by the prevailing party wholesale" and explaining a court should not "accept[] uncritically [the] representations concerning the time expended").

The Court has discretion to use either a lodestar or percentage of the common fund calculation to evaluate a fee request.  *Named Plaintiffs & Settlement Class Members v. Feldman (In re Apple Inc. Device Performance Litig.)*, 50 F.4th 769, 786 (9th Cir. 2022).  The Ninth Circuit observed that "either method may… have its place in determining what would be reasonable compensation."  *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989).  Whether the Court applies the lodestar or percentage method, the fees awarded must comply with Rule 23 and be "fundamentally fair, adequate, and reasonable."  *Staton*, 327 F.3d at 963 (quoting Fed.R.Civ.P. 23(e)).

### A.      Lodestar method

The lodestar method calculates attorney fees by "by multiplying the number of hours reasonably expended by counsel on the particular matter times a reasonable hourly rate."  *Florida*, 915 F.2d at 545 n. 3 (citing *Hensley*, 461 U.S. at 433).  The product of this computation, the "lodestar" amount, yields a presumptively reasonable fee.  *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013); *Camacho v. Bridgeport Fin., Inc*., 523 F.3d 973, 978 (9th Cir. 2008).  Next, the Court may adjust the lodestar upward or downward using a "multiplier" considering factors adopted by the Ninth Circuit:

> (1) the time and labor required, (2) the novelty and difficulty of the
> questions involved, (3) the skill requisite to perform the legal service

1
2
3
4

> properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.[8]

5   *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975); *Quesada v. Thomason*, 850 F.2d

6   537, 539 (9th Cir. 1988) (indicating the Court should "consider[] some or all twelve relevant criteria

7   set forth in *Kerr*" to determine whether to deviate from the lodestar)

8       **B.      Percentage from the common fund**

9       As the name suggests, under this method, "the court makes a fee award on the basis of some

10  percentage of the common fund." *Florida*, 915 F.2d at 545 n. 3. "The typical range of acceptable

11  attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with 25%

12  considered the benchmark." *Vasquez v. Coast Valley Roofing*, 266 F.R.D. 482, 491 (E.D. Cal. 2010);

13  *see also In re Apple Inc. Device Performance Litig.*), 50 F.4th 769, 786 (noting the Ninth Circuit

14  established "[t]he benchmark percentage is 25%" of the common fund).

15      To evaluate whether the requested percentage is reasonable, courts may consider a number of

16  factors, including: (1) the results obtained for the class; (2) the risks undertaken by class counsel,

17  including the complexity of the issues; (3) the length of the professional relationship between class

18  counsel and the plaintiffs; and (5) the market rate, with a lodestar cross-check. *Vizcaino v. Microsoft*

19  *Corp.*, 290 F.3d 1043, 1048-1050 (9th Cir. 2002); *Six Mexican Workers v. Ariz. Citrus Growers*, 904

20  F.2d 1301, 1311 (9th Cir. 1990). The percentage awarded as fees may be adjusted below or above the

21  benchmark, but the Court's reasons for adjustment must be clear. *Graulty*, 886 F.2d at 272; *see also In*

22  *re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) ("courts typically calculate

23  25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the

24  record of any 'special circumstances' justifying a departure").

25      **C.      Fee applicant's burden**

26      Notably, the Court must consider similar factors under both the lodestar method and awarding a

27

28  _____
[8] The Ninth Circuit has since determined the "desirability" of a case is no longer a relevant factor. *Resurrection Bay Conservation Alliance v. City of Seward*, 640 F.3d 1087, 1095, n.5 (9th Cir. 2011) (citation omitted).

percentage of the common fund. *See Kerr*, 526 F.2d at 70; *Vizcaino*, 290 F.3d at 1048-1050. With either method, the fee applicant bears the burden of establishing that the fees and costs were reasonably necessary to achieve the results obtained. *See Fischer v. SJB-P.D., Inc.*, 214 F.3d 1115, 1119 (9th 2000). Therefore, a fee applicant must provide records documenting the tasks completed and the amount of time spent. *Hensley v. Eckerhart*, 461 U.S. 424, 424 (1983); *Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 945-46 (9th Cir. 2007). "Where the documentation of hours in inadequate, the district court may reduce hours accordingly." *Hensley*, 461 U.S. at 433.

## II.      Evaluation of the Fees Requested

Class Counsel contend use of "the percentage of common fund doctrine [is] appropriate." (Doc. 55-1 at 23.) Under the "common fund" doctrine, attorneys who create a common fund for a class may be awarded fees from that fund. *Hanlon*, 150 F.3d at 1029; *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole"). An award from the common fund "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense," and application of the doctrine is appropriate "when each member of a certified class has an undisputed and mathematically ascertainable claim to part of a lump-sum judgment recovered on his behalf." *Boeing Co.*, 444 U.S. at 478. Because the Settlement applies a *pro rata* distribution formula to determine the amount paid to each Class Member, the Court agrees application of the common fund doctrine is appropriate.

Significantly, when fees are to be paid from a common fund, as here, the relationship between the class members and counsel "turns adversarial." *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994). The Ninth Circuit observed:

> [A]t the fee-setting stage, plaintiff's counsel, otherwise a fiduciary for the class, has become a claimant against the fund created for the benefit of the class. It is obligatory, therefore, for the trial judge to act with a jealous regard to the rights of those who are interested in the fund in determining what a proper fee award is.

*Id.* at 1302 (internal quotation marks, citation omitted). As a result, the district court must assume a fiduciary role for the class members in evaluating the reasonableness of a request for fees from the

common fund.  *Id.*; *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009) ("when fees are to come out of the settlement fund, the district court has a fiduciary role for the class").

### A.   Time and labor required

Class Counsel report they worked 515.1 hours on this case, through the preparation of the motion for final approval.[9]  (Doc. 55-1 at 17, Mallison Decl. ¶ 44; *see also* Doc. 55-6.)  This reported amount includes 59.4 hours by Stan Mallison and 25.1 hours by Hector Martinez.  (Doc. 55-6 at 2.)  Class Counsel have not identified any evidence that they were precluded from other work because of this action, and the little time expended by the lead partners—though the firm began working on this action four years ago—supports a conclusion that the time and labor required was not burdensome.  As a result, this factor does not support the requested upward departure from the benchmark.

### B.   Results obtained for the Class

The result achieved for the class is a major factor to be considered in making a fee award. *Hensley*, 461 U.S. at 436; *Wilcox v. City of Reno*, 42 F.3d 550, 554 (9th Cir. 1994).  The Ninth Circuit observed that "[e]xceptional results are a relevant circumstance" to support an adjustment from the benchmark award.  *Vizcaino*, 290 F.3d at 1048; *see also Resnick v. Frank (In re Online DVD-Rental Antitrust Litigation)*, 779 F.3d 934, 954-55 (9th Cir. 2015) (observing that "the extent to which class counsel achieved exceptional results for the class" is a proper factor for a court evaluating "a request for attorneys' fees that was calculated using the percentage-of-recovery method" [internal quotation marks, citation omitted].)

Class Counsel observe that "the recovery of $600,000 will provide the 152 claimants with a net recovery of approximately $2,203.95 per employee on average, with the highest estimated payment of $17,748.75."[10] (Doc. 55-1 at 24, citing Reyes Decl. ¶ 12 [Doc. 55-9 at 5].)  Class Counsel contend "the recovery in this case is very good."  (*Id.*)  Further, they contend "the excellent results achieved by the Settlement are demonstrated by the absence of any objections to either the Settlement or to Class Counsel's request for fees, both of which were described clearly in the Notice."  (*Id.*)

Notably, however, the gross settlement fund of $600,000 represents approximately 26% of the

---

[9] As discussed below, the total reported includes more than 50 hours for clerical tasks, to be deducted from the lodestar.
[10] Although Class Counsel refer to the class members as "claimants," claims were not required to obtain a settlement share.

maximum possible recovery.  Though this provides an immediate monetary benefit to Class Members, the results are not exceptional.  This Court previously indicated the recovery of approximately 30% of a defendant's maximum liability exposure was not "exceptional."  *See, e.g., Monterrubio*, 291 F.R.D. at 466 (finding "the circumstances of the litigation simply do not lead the Court to conclude that the result is 'exceptional'" where the recovery for the class equaled "30% of Plaintiff's calculation of Defendant's maximum liability exposure"); *see also Ontiveros*, 303 F.R.D. at 373 (expressing doubt that a settlement totaling one-half to one-third of the maximum potential recovery amount was exceptional enough "to justify a departure from the 25% benchmark"); *Clayton v. Knight Transp.*, 2013 WL 5877213, at *7 (E.D. Cal. Oct. 30, 2013) (finding the results achieved for the class were "good" but not "exceptional" and did not support an upward departure from the benchmark when the class members were "anticipated to recover less than 50% of their potential recovery").  Therefore, this factor does not support the requested upward departure from the benchmark.

## C.    Risks undertaken by counsel

The risk undertaken is an important factor in determining the fee award.  *Chemical Bank v. City of Seattle*, 19 F.3d 1297, 1299-1301 (9th Cir. 1994).  The Supreme Court explained, "the risk of loss in a particular case is a product of two factors: (1) the legal and factual merits of the claim, and (2) the difficulty of establishing those merits."  *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992).  When class counsel undertake an "extremely risky" action, an upward departure from the benchmark is appropriate.  *Vizcaino*, 290 F.3d at 1048.  For example, the Ninth Circuit determined an award above the benchmark was appropriate where "counsel pursued [the] case in the absence of supporting precedents," and "[t]wice plaintiffs lost in the district court — once on the merits, once on the class definition — and twice counsel succeeded in reviving their case on appeal."  *Id.*, 290 F.3d at 1048.

Class Counsel argue the fee request above the benchmark is justified, in part, because "there were significant risks in pursuing this case."  (Doc. 55-1 at 24.)  Specifically, Class Counsel contend:

> As in any class action, the Court had wide discretion to grant or deny certification, and the risk existed that no class would be certified. Even more dangerous was the Defendant's financial condition in light of the post- 2020 economy, including the real risk that Defendant would declare bankruptcy and the class would recover nothing.

(*Id.*)

Notably, there is no evidence before the Court related to Defendant's financial condition, such that the Court may determine the extent to which this risk rises above speculation.  The remaining risks identified by Class Counsel to support the fee request are not unique to this action, but rather apply to generally to class action litigation.  Such risks do not support a departure from the benchmark.  *See Vizcaino*, 290 F.3d at 1048; *see also Sebastian v. Sprint/United Mgmt. Co.*, 2019 WL 13037010, at *7 (C.D. Cal. Dec. 5, 2019) (finding the plaintiff did not identify any risks that "set [the] case apart from other wage-and-hour class actions" and the "recitation of ordinary—average—risks… counsels in favor of approving the fee award at the benchmark"); *Mortley v. Express Pipe & Supply Co.*, 2019 WL 13030315, at *5 (C.D. Cal. May 29, 2019) (finding the plaintiff's assertion that "wage and hour class actions are risky because they are hard to certify" was insufficient to support an upward departure from the benchmark, because the plaintiff failed "to show how the risks he faced were significant or unique in relation to other similar class actions").  Accordingly, this factor does not support the requested upward departure from the benchmark.

### D.    Financial risk related to contingent fee

Class Counsel contend "the contingent nature of the fee and the financial burden" support the requested fee award. (Doc. 55-1 at 25, emphasis omitted.). Mr. Mallison reports that Class Counsel litigated the action "at significant risk to themselves of recovering no fee."  (Doc. 55-2 at 17, Decl. ¶ 44; *see also id.* at 18, ¶ 45.)  Even though Class Counsel worked on a contingency basis, there is no evidence that Class Counsel faced atypical risks in doing so with this action.  Although Mr. Mallison asserts his firm "would not have agreed to represent Plaintiff in this case …if we were not confident that we would be awarded a contingency fee approximately one-third of the potential recovery," he admits also that "[t]he firm chose the class representative" in this action.  (Doc. 55-2, ¶¶ 16, 43.)  Further, Mr. Mallison acknowledges that "[o]ne hundred percent of Mallison & Martinez's legal practice involves legal work that is on a contingency fee basis."  (*Id.* at 17, ¶ 43.)

Notably, the Ninth Circuit suggested the distinction between a contingency arrangement and a fixed fee alone does not merit an enhancement from the benchmark. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 n.7 (9th Cir. 2011) ("whether the fee was fixed or contingent" is "no longer valid" as a factor in evaluating reasonable fees); *but see In re Online DVD-Rental Antitrust*

*Litigation*, 779 F.3d at 954-55 (finding the contingent nature of litigation remains a relevant factor to evaluate a request from the common fund).  Regardless, risk associated with the contingent nature of the fee alone does not justify an upward departure of the benchmark.  *See Correa v. Zillow, Inc.*, 2021 WL 4925394, at *6 (C.D. Cal. June 14, 2021) (standing alone, "the attorneys' contingent risk… does not justify an upward departure of the benchmark"); *Clayton v. Knight Transp.*, 12013 WL 5877213, at *8 (E.D. Cal. Oct. 30, 2013) (acknowledging the contingent nature was "an important factor," but declining to grant an upward departure where "the risks associated with this case are no greater than [those] associated with any other wage and hour action and no extraordinary circumstances exist that would support an increase from the 25% benchmark").  Because Class Counsel do not identify any unusual risk with the contingent nature of their fee in this action—particularly where *all* of the firm's legal work is on contingency fee basis—this factor does not support the requested upward departure from the benchmark.  *See Vizcaino*, 290 F.3d at 1048

### E.   Complexity of issues and skill required

The complexity of issues and skills required may support a departure from the benchmark fee award.  *See In re Pac. Enters. Sec. Litig.,* 47 F.3d 373, 379 (9th Cir. 1995) (finding no abuse of discretion in awarding attorney's fees that totaled 33% settlement fund, finding a departure from the benchmark was warranted "because of the complexity of the issues and the risks"); *see also Ross v. Bar None Enters.*, 2015 WL 1046117, at *9 (E.D. Cal. Mar. 10, 2015) ("Courts have recognized that the novelty, difficulty and complexity of the issues involved are significant factors in determining a fee award" [citation omitted]).

Class Counsel contend "this case required exceptional skill in obtaining the relevant pay and time records, performing an expert analysis thereon, certifying a class, and securing Defendant's agreement to pay the amount agreed upon in the Settlement."  (Doc. 55-1 at 25.)  According to Class Counsel, "Very few firms have the expertise to be able to effectively and efficiently carry out these tasks."  (*Id.*)  Class Counsel assert their "skills in developing an extensive damage analysis and convincing Defendant of its litigation exposure under California law were essential to achieving the Settlement."  (*Id.*) Further, Class Counsel contend they "thoroughly investigated the case and advocated on behalf of the class successfully," and "the quality of the work was exceptional."  (*Id.*)

Notably, Class Counsel do not identify any complex issues faced in this matter.  Indeed, it appears most of the work was performed by new attorneys and paralegals at the firm, rather than the more-experienced partners.  (*See* Doc. 55-6 at 2 [the lodestar summary, indicating the reported 515.1 hours included 241.3 hours by Juan Gamboa, who was admitted to the bar in 2019; 110.6 hours from paralegals; and 33.7 hours from Lilianna Romero, who was first employed as a law clerk and was admitted to practice in November 2021].)  This strongly suggests the matter was not complex and did not require the skills of experienced litigators.

Furthermore, the Court is unable to find "the quality of the work was exceptional" in this matter, as argued by counsel.  For example, the initial agreement indicated the class should be certified under state law, rather than the Federal Rules of Civil Procedure.  (Doc. 42-3 at 13, § III.E.1.a(i).)  As a result, the parties were required to modify the agreement, and Class Counsel also filed an amended motion for preliminary approval.  (*See* Docs. 44, 46, 47.)  In the order granting preliminary approval, the Court ordered Plaintiff to serve the amended agreement upon the LWDA and to "address whether the LWDA commented on either the initial settlement or amended settlement in the motion for final approval." (*Id.* at 25, n.25.)  Because Class Counsel failed to do so, supplemental briefing was required for the pending motion for the Court to ascertain whether the LWDA was served, and whether the LWDA made any comment on the amended agreement.  (Docs. 58, 59.)

Class Counsel also failed to address the factors identified under Rule 23(e)(2) of the Federal Rules of Civil Procedure, which includes "specific factors [the Court must] consider in determining whether a settlement is 'fair, reasonable, and adequate.'" *See Briseño*, 998 F.3d at 1023.  Class Counsel referred only to factors identified by the Ninth Circuit prior to the Rule 23(e) amendment (*see* Doc. 55-1 at 17-20), yet the Ninth Circuit has indicated consideration of those factors is "not enough to survive appellate review." *See Kim v. Allison*, 8 F.4th 1170, 1179 (9th Cir. 2021) (quoting *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 946); *see also Briseño*, 998 F.3d at 1025-26.  This Court has repeatedly referred to Rule 23(e)(2) in this matter and reminded Plaintiff to address the amended Rule in seeking approval of the Settlement.  (*See, e.g.,* Doc. 44 at 2-3; Doc. 46 at 2; Doc. 50 at 14).  Nevertheless, counsel failed to do so, and this failure also undermines the assertions of Class Counsel regarding the quality of work.

40

On the other hand, the overall experience of Class Counsel undoubtedly benefited Plaintiff and Class Members. Further, Class Counsel retained an expert for data analysis and calculated damages in advance of mediation. (*See* Doc. 55-2 at 10, ¶ 19.) The skill and experience of Class Counsel with wage and hour litigation very likely assisted the parties in evaluating the strengths and weaknesses of the action. Accordingly, the Court finds this factor supports an award equal to the benchmark. *See Monterrubio*, 291 F.R.D. at 458 (declining to depart from the benchmark based upon the "skill and quality of the work in [the] particular case," though also acknowledging class counsel were "skilled litigators in the wage and hour context").

**F.  Length of the professional relationship**

Reviewing the time sheets provided by Class Counsel, it appears the "intake" contact with Plaintiff occurred on March 22, 2019. (Doc. 55-6 at 8.) Thus, the professional relationship has lasted approximately four years to date. The short duration of the professional relationship may warrant an award below the benchmark. *See Six Mexican Workers v*, 904 F.2d at 1311 (finding "the 25 percent standard award" was appropriate although "the litigation lasted more than 13 years").

**G.  Awards in other cases**

Notably, as discussed above, 25% of a common fund is the "benchmark award for attorney fees" in the Ninth Circuit. *Hanlon*, 150 F.3d at 1029; *see also Vizcaino*, 290 F.3d at 1047. Previously, this Court observed that "[t]he typical range of acceptable attorneys' fees in the Ninth Circuit is 20 percent to 33.3 percent of the total settlement value." *Barbosa v. Cargill Meat Solutions Corp*., 297 F.R.D. 431, 448 (E.D. Cal. 2013). Thus, the amount requested by Class Counsel is at the very highest point in this range. *See id.*

Class Counsel asserts the fee request "is in line with similar class action wage and hour cases on behalf of mechanics which Plaintiffs' counsel has litigated and settled." (Doc. 55-1 at 25-26, citing *Sandoval, et al. v. Autowest Collision Repairs*, Inc., et al., N.D. Cal., Case No. 3:13-CV-03230; *Selby, et al. v. TWC Dealer Group, Inc., et al., Contra Costa Superior Court*, Case No. C18-00247; *Ontiveros v. Zamora Automotive Group, et al*., E.D. Cal., Case No. 2:08-CV-00567).) Class Counsel observe that in each of these cases, they were awarded 33 1/3 of the gross fund in fees. (*Id.*) However, Class Counsel do not provide *any* analysis as to how these cases were similar to the matter now pending. The

41

1    Court declines to manufacture arguments on behalf of Class Counsel.  As discussed above, factors

2    identified by the Ninth Circuit do not support an upward departure from the benchmark in this matter.

3         **H.    Lodestar crosscheck and market rate**

4         The Court may perform a lodestar cross-check to assist in the determination of whether the fees

5    sought from a common fund are reasonable.  *See Indirect Purchaser Class v. Erwin (In re Optical Disk*

6    *Drive Prods. Antitrust Litig.*), 959 F.3d 922, 933 (9th Cir. 2020) ("we have encouraged courts using the

7    percentage-of-recovery method to perform a cross-check by applying the lodestar method to confirm

8    that the percentage-of-recovery amount is reasonable"); *see also In re Apple Device Performance Litig.*,

9    50 F.4th 769, 786 (9th Cir. 2022) (also encouraging a lodestar crosscheck "when utilizing the

10   percentage-of-recovery method").  The lodestar is calculated by multiplying the time "reasonably

11   expended" by counsel on the by "a reasonable hourly rate."  *Florida*, 915 F.2d at 545 n. 3 (citing

12   *Hensley*, 461 U.S. at 433).

13        Class Counsel report the lodestar totals $235,373.90 and contend this supports an award of fees

14   in the amount requested of $200,000.  (Doc. 55-1 at 22; *see also* Doc. 55-6 at 2.)  However, this

15   lodestar calculation from Class Counsel suffers serious flaws, both with the time included and hourly

16   rates applied.

17                      1.    Time expended

18        In general, the first step in determining the lodestar is to determine whether the number of

19   hours expended was reasonable.  *Fischer*, 214 F.3d at 1119.  When the lodestar is used as a cross-

20   check for a fee award, the Court is generally not required to perform an "exhaustive cataloguing and

21   review of counsel's hours."  *See Barbosa v. Cargill Meat Sols. Corp.,* 297 F.R.D. 431, 451 (E.D. Cal.

22   2013) (citation omitted).  However, the Court has the discretion to review submitted time sheets to

23   determine whether the time expended was reasonable.  *See In re Washington Public Power Supply*

24   *System Securities Litigation,* 19 F.3d 1291, 1298 (9th Cir.1994) (concluding the district court acted

25   within its discretion in reducing the lodestar for unnecessary and duplicative work).  Because a cursory

26   review of the records revealed significant flaws related to the lodestar calculation—including clerical,

27

28

                                                    42

unnecessary, and duplicative tasks—the Court has performed a detailed review of the records.[11]

### a.   Clerical tasks

The Supreme Court determined that "purely clerical or secretarial tasks should not be billed at a paralegal or [lawyer's] rate, regardless of who performs them." *Missouri v. Jenkins*, 491 U.S. 274, 288 n.10 (1989).  As a result, courts eliminate clerical tasks from lodestar calculations.  *See, e.g., Nadarajah v. Holder*, 569 F.3d 906, 921 (9th Cir. 2009); *Marquez v. Harper Sch. Dist.,* 546 F. App'x 659, 660 (9th Cir. 2013) ("[t]he district court was within its discretion" when it declined to award fees for clerical tasks); *Harris v. L & L Wings, Inc.,* 132 F.3d 978, 985 (4th Cir. 1997) (approving the deduction of hours spent on secretarial tasks from the lodestar calculation); *see also Weeks v. Kellogg Co.*, 2013 WL 6531177, at *32 (C.D. Cal. Nov. 23, 2013) ("In calculating the lodestar, courts typically exclude time spent on clerical or ministerial tasks because such tasks are properly considered part of an attorney's overhead and are reflected in his or her hourly rate.").  Such tasks may include: "creating indexes for a binder; filing emails, memoranda, and other correspondence; updating the case calendar with new dates; copying, scanning, and faxing documents; and filing or serving documents." *Moore v. Chase, Inc*., 2016 WL 3648949, at *3 (E.D. Cal. July 7, 2016), citing *Prison Legal News v. Schwarzenegger*, 561 F.Supp.2d 1095, 1102 (N.D. Cal. 2008).

### i.   Document retrieval, saving, and copying

Courts have declined to award fees for "retrieving electronic court documents or copying" due to the clerical nature of the tasks.  *Jones v. Metropolitan Life Ins. Co*., 845 F. Supp. 2d 1016, 1027 (N.D. Cal. 2012); *Schmidt v. City of Modesto*, 2018 WL 6593362, at *9 (E.D. Cal. Dec. 18, 2018) (indicating clerical work included downloading, saving, and printing documents); *T.B. v. San Diego Unified Sch. Dist*., 2017 U.S. Dist. LEXIS 218434, at *97 (S.D. Cal. Oct 2, 2017) ("scanning and saving" documents is clerical work). Similarly, courts decline to award fees for staff emailing documents. *See Schmidt v. City of Modesto*, 2018 WL 6593362, at *9 (E.D. Cal. Dec. 18, 2018) (declining to award fees for emailing documents, noting emailing was a clerical task rather than a

---

[11] Due to the significant number of billing entries, which total nearly 50 pages, the Court declines to identify each and every billing entry deducted from the lodestar.  However, the Court categorized the billing entries to identify the tasks that are not compensable—particularly with clerical tasks—and the time stricken from the lodestar calculation.

paralegal task); *LaToya A. v. S.F. Unified Sch. Dist.*, 2016 WL 344558, at *9 (N.D. Cal. Jan. 28, 2016) (forwarding documents to attorneys is "purely clerical work").  Thus, to the extent the billing records include such tasks, fees for such tasks should not be awarded.

Billing records from Class Counsel include many entries by paralegals related to downloading documents, saving documents, and making copies.  For example, Daniel Arjona billed 0.1 hour for downloading and saving an order on October 28, 2021.  (Doc. 55-6 at 3.)  He also billed for downloading and saving orders on January 10 and April 27, 2022.  (*Id.* at 3, 5.)  Logan Bowie billed 0.4 hour for saving documents and sending them to staff.  (*Id.* at 7.)  Rocio Espinoza billed 0.6 hour for e-mailing documents to counsel.  (*Id.* at 8.)  Cesar Juarez repeatedly billed for downloading documents— such as the First Amended Complaint, summons, Defendant's Answer, communication from opposing counsel, the Joint Scheduling Report, and court orders—and saving the documents.  (*See, e.g., id.* at 29-30, 32-33.)  These are only a handful of examples because there are more than 20 billing entries related to document retrieval, saving, and copying.  Based upon the Court's review of the billing records, 11.4 hours will be deducted from the lodestar, which includes 0.9 hour for Daniel Arjona, 1.3 hours for Logan Bowie, 0.6 hour for Rocio Espinoza, and 8.6 hours for Cesar Juarez.

### ii.   Calendaring

This Court and others in the Ninth Circuit indicated calendaring deadlines is a clerical task that should not being included in a fee award.  *See, e.g., Hill v. Comm'r of Soc. Sec.*, 428 F. Supp. 3d 253, 265 (E.D. Cal. 2019) (observing clerical staff could "easily" complete "calendaring of court dates" and reducing the fee award); *Campbell v. AMTRAK*, 718 F.Supp.2d 1093, 1105 (N.D. Cal. 2010) (deducting calendaring as clerical work from the fee award); *Doran v. Vicorp Rests., Inc.*, 407 F.Supp.2d 1120, 1125 (C.D. Cal. 2005) (noting "calendaring court dates" is clerical and reducing the fee award).  Likewise, tasks related to scheduling are clerical, non-compensable tasks.  *See Soler v. County of San Diego,* 2021 WL 2515236, at *10 (S.D. Cal. June 18, 2021) (identifying "time spent scheduling... [as] clerical tasks non-compensable at any billing rate").

Paralegals at Mallison & Martinez included more than 30 entries for calendaring and noting deadlines.  (*See generally* Doc. 55-6.)  For example, Daniel Arjona billed 0.6 hours when he "calendared dates set by Order granting [the motion for preliminary approval]" on October 25, 2022.

(*Id.* at 5.)  Logan Bowie billed 0.4 hours on June 29, 2022 for calendaring tasks, including the hearing date on the motion for preliminary approval and then updating the calendar after the Court issued a minute order vacating the hearing.  (*Id.* at 7.)  Cesar Juarez billed for calendaring hearings deadlines throughout the litigation, from the initial disclosures deadlines and scheduling conference dates through calendaring a "reminder to complete Long Form Settlement Agreement" on June 29, 2021. (*See id.* at 28-38.)

Associates Juan Gamboa and Daniel Keller also billed for administrative tasks related to calendaring and scheduling in this action. For example, Juan Gamboa indicated that he spent 0.3 hour on January 17, 2020 to calendar the deadline to file an amended complaint; and 0.7 hour in April 2020 reviewing deadlines and communications regarding calendaring.  (*Id.* at 12, 14.)  Similarly, Daniel Keller billed for discussions with the paralegal regarding filing deadlines and calendaring.  (*See id.* at 38.)  Such time will also be deducted from the lodestar calculation as clerical work.  *See Henry v. Comm'r of SSA*, 2023 WL 14343302, at *6 (D.Az. Jan. 31, 2023) ("Communications such as emails and conferences may be considered clerical tasks when the discussion is about deadlines, filings, and other non-substantive administrative work"); *Mrkonjic v. Delta Family-Care*, 2014 WL 12967579 (C.D. Cal. July 18, 2014) (explaining correspondence regarding deadlines is clerical and "not compensable" [citation omitted]).

Based upon the Court's review of billing entries related to calendaring and scheduling, the Court finds 30.1 hours must be deducted from the lodestar, including 5.6 hours for Juan Gamboa, 0.5 hour for Daniel Keller, 1.3 hour for Daniel Arjona, 0.8 hour for Logan Bowie, 0.6 hour for Rocio Epinoza, and 21.3 hours for Cesar Juarez.

### iii.    Filing

The Ninth Circuit indicated "filing, transcript, and document organization time was clerical in nature and should have been subsumed in firm overhead."  *See Nadarajah*, 569 F.3d at 921; *see also Garcia v. Colvin*, 2013 WL 5347494, at *7 (E.D. Cal. Sept. 23, 2013) (observing the "document emailing and e-filing constitutes clerical or secretarial work and should not be awarded as these activities should be considered overhead costs," and explaining "filing documents is a clerical task, regardless of whether counsel has delegated the authority to his paralegal to access his CM/ECF

account"); *United States v. One 2008 Toyota Rav 4 Sports Utility Vehicle*, 2012 WL 5272281, at *12 (C.D. Cal. Oct. 18, 2012) (declining to award fees for time spent e-filing documents with the court).

Several paralegals billed for filing, and this time must be deducted from the lodestar.  Daniel Arjona billed a total of 0.7 hour for filing the motion for preliminary approval, and the revised class notice.  (Doc. 55-6 at 4-5.)  Logan Bowie billed 1.6 hours to "File Doc(s)" on June 27, 2022.  (*Id.* at 7.)  Cesar Juarez also billed 5.6 hours for filing numerous documents including—but not limited to— the complaint, waiver of service of summons, the form declining consent to magistrate judge jurisdiction, the joint scheduling report, and amended complaint. (*See, e.g., id.* at 26, 28-29, 32, 37.)

In addition, attorneys Hector Martinez and Heather Hamilton billed for communications with paralegals regarding filing, and this time is not compensable.  *See Henry*, 2023 WL 1434332, at *6 (communications about filing qualifies as clerical work, to be deducted from the lodestar calculation). Specifically, Ms. Hamilton billed 0.1 hour for communicating with a paralegal regarding the filing of a joint statement on April 25, 2022, and 0.1 hour for sending a document to a paralegal for filing on October 28, 2022.  (Doc. 55-6 at 25-26.)  Mr. Martinez also billed 0.9 hour on November 7, 2019 for a meeting with Cesar Juarez related to "Filing."  (*Id.* at 47.)  The total 0.2 hour for Ms. Hamilton and 0.9 hour for Mr. Martinez will also be deducted from the attorneys' lodestar calculations.

Based upon the Court's review of the records, the entries related to filing results in a total deduction of 9.0 hours from the lodestar calculation for the paralegals and attorneys identified above.

### iv.  Communications with the Court

This Court and others have declined to award fees for communicating with the Court—such emailing or calling courtroom deputy—due to the clerical nature of the task. *See, e.g., Miller v. Schmidt*, 2017 WL 633892, at *7 (E.D. Cal. Feb. 15, 2017) (agreeing with the party opposing the fee request that "communicating with the Court staff and court reporters is purely clerical work" and excluding the time billed for communications with the courtroom deputies from a fee award); *Robinson v. Plourde*, 717 F. Supp. 2d 1092, 1099-1100 (D. Haw. 2010) ("communication with court staff, scheduling, and corresponding regarding deadlines, are clerical and not compensable [tasks]"); *Comcast of Illinois X v. Kwak*, 2010 WL 3781768, at *6 (D. Nev. Sept. 20, 2010) (declining to award fees for "ministerial tasks such as contacting court staff for scheduling reasons or noting due dates").

Logan Bowie billed 0.3 hour on June 29, 2022 for e-mailing the courtroom deputy to request a telephonic appearance at a hearing.  (Doc. 55-6 at 8.)  Juan Gamboa billed 0.4 hour for emailing the Court about telephonic appearances, including 0.2 hour on January 16, 2020, and 0.2 hour on December 29, 2020. (*Id.* at 11, 18.)  Mr. Gamboa also billed 0.7 hour for phone calls with the Court regarding a vacated hearing in April 2020.  (*Id.* at 14.) Similarly, Marbeya Garcia billed 0.6 hour for communications with the Court related to telephonic appearances, including 0.2 hour on March 31, 2020; 0.1 hour for listening to a voicemail from the clerk on April 2, 2020; 0.1 hour for calling the court clerk and leaving a voicemail on April 10, 2020; 0.2 hour for a call and an email with the "courtroom clerk for telephonic request" on April 13, 2020.  (*Id.* at 24-25.)  Cesar Juarez billed 0.1 hour for a "Call to Court Clerk" regarding filing the Court's magistrate judge jurisdiction form.  (*Id.* at 28.)  The Court finds each of these communications were clerical in nature, and the identified time spent emailing and calling the Court should be deducted from the lodestar.  *See Robinson*, 717 F. Supp. 2d at 1099-1100; *Miller*, 2017 WL 633892, at *7.  This results in a total deduction of 2.1 hours, including 0.3 hour for Logan Bowie, 1.1 hours for Juan Gamboa, 0.6 hour for Marbeya Garcia, and 0.1 hour for Cesar Juarez.

### v.   CourtCall arrangements

Marbeya Garcia billed 0.7 hour for tasks related to setting up telephonic appearances via CourtCall, which is a vendor that may be used by counsel to make remote appearances for hearings. (Doc. 55-6 at 24-25.)  There is nothing to suggest that scheduling CourtCall – including confirming appearances via Courtcall or modifying such confirmations – requires the skill of a paralegal or lawyer. Indeed, such tasks are akin to scheduling and calendaring.  Therefore, the Court deducts 0.7 hour from the lodestar for Mabeya Garcia.

### b.   Unnecessary tasks

The Supreme Court observed that a fee applicant "should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary" when calculating a lodestar.  *Hensley*, 461 U.S. at 434.  As a result, the Court may discount unnecessary tasks from lodestar calculations.  *See Van Gerwin v. Guarantee Mut. Life Co.*, 241 F.3d 1041, 1045 (9th Cir. 2000) ("A district court should exclude from the lodestar amount hours that are not reasonably

1    expended because they are 'excessive, redundant, or otherwise unnecessary'"); *Global Ampersand,*

2    *LLC v. Crown Eng'g & Constr.*, 261 F.R.D. 495, 502 (E.D. Cal. 2009) (same). A review of the billing

3    records reveals unnecessary tasks billed by counsel on this matter.

4          Natalia Ramirez Lee billed 0.1 for each "Weekly Check-In" on April 9, 2019; April 16, 2019;

5    April 23, 2019; and April 30, 2019.  (Doc. 55-6 at 50.)  However, Ms. Lee did not perform any

6    substantive work on the action.  (*See generally* Doc. 55-6.)  The Court finds her weekly check-ins

7    were unnecessary because she did not perform any work on the matter. Therefore, the lodestar will be

8    reduced by 0.4 hour for Ms. Lee.

9                          *c.      Duplicative tasks*

10         Duplicative work typically occurs when, as there, there is more than one attorney representing

11   a client.  *See Norman v. Housing Authority of City of Montgomery*, 836 F.3d 1292, 1301 (11th Cir.

12   1988).  However, the Ninth Circuit has "recognized that 'the participation of more than one attorney

13   does not necessarily constitute an unnecessary duplication of effort.'" *McGrath v. County of Nevada*,

14   67 F.3d 248, 255 (9th Cir. 1995) (quoting *Kim v. Fujikawa*, 871 F.2d 1427, 1435 n.9 (9th Cir. 1989)).

15   Thus, the Court must look to the billing records to determine if work was duplicative or unnecessary.

16   *See, e.g., Harlow v. Metro. Life Ins. Co.*, 379 F. Supp. 3d 1046, 1056-57 (C.D. Cal. 2019).

17         Here, it appears the work performed by Tania Fonseca—for which she billed 1.0 hour—was

18   duplicative of other attorneys.  In August 2021, Juan Gamboa billed 6.5 hours related to preparation of

19   the "long form settlement agreement," which included consulting partner Stan Mallison.  (Doc. 55-6 at

20   24.)  Between October 7 and October 15, 2021—after Defendant proposed changes to the settlement—

21   Daniel Keller reviewed the changes, discussed the agreement with Mr. Mallison, and revised the

22   agreement.  (*Id.* at 38-39.)  On October 15, 2021, partner Mr. Mallison billed 1.3 hours for his review

23   of the settlement agreement.  (*Id.* at 46.)  However, on October 15, 2021, Ms. Fonseca also billed 1.0

24   hour to "[r]eview and revise [the] settlement agreement."  (*Id.* at 10.) This was duplicative of the work

25   of Mr. Mallison and Mr. Keller.  Therefore, the Court will deduct the billed 1.0 hour for Ms. Fonseca

26   from the lodestar calculation.[12]

27

28   ───────────────────────
     [12] Notably, although the 1.0 hour was included in Class Counsel's lodestar calculation, Ms. Fonesca was not identified as
     an attorney who worked on the action by Mr. Mallison.  (*See* Doc. 55-2 at 6-9, Mallison Decl. ¶¶ 7-14.)

                                            48

1

2.      Hourly rates

2

The Court must also determine whether the hourly rates are reasonable to calculate the

3

lodestar.  *See Florida*, 915 F.2d at 545 n.3.  The Supreme Court explained attorney fees are to be

4

calculated with "the prevailing market rates in the relevant community."  *Blum v. Stenson*, 465 U.S.

5

886, 895-96 and n.11 (1984).  In general, the "relevant community" for purposes of determining the

6

prevailing market rate is the "forum in which the district court sits."  *Camacho v. Bridgeport Fin., Inc.*,

7

523 F.3d 973, 979 (9th Cir. 2008).  Thus, when a case is filed in the Eastern District of California, this

8

District "is the appropriate forum to establish the lodestar hourly rate…"  *See Jadwin v. County of*

9

*Kern*, 767 F.Supp.2d 1069, 1129 (E.D. Cal. 2011).

10

The fee applicant bears a burden to establish that the requested rates are commensurate "with

11

those prevailing in the community for similar services by lawyers of reasonably comparable skill,

12

experience, and reputation."  *Blum*, 465 U.S. at 895 n.11.  An applicant meets this burden by

13

producing "satisfactory evidence—in addition to the attorney's own affidavits—that the requested

14

rates are in line with those prevailing in the community for similar services by lawyers of reasonably

15

comparable skill, experience and reputation."  *Id.*; *see also Chaudhry v. City of Los Angeles*, 751 F.3d

16

1096, 1110-11 (9th Cir. 2014) ("Affidavits of the plaintiffs' attorney[s] and other attorneys regarding

17

prevailing fees in the community … are satisfactory evidence of the prevailing market rate.").  The

18

Court may apply "rates from outside the forum ... 'if local counsel was unavailable, either because

19

they are unwilling or unable to perform because they lack the degree of experience, expertise, or

20

specialization required to handle properly the case.'"  *Barjon v. Dalton*, 132 F.3d 496 (9th Cir. 1997)

21

(quoting *Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992)).

22

To calculate their lodestar, Class Counsel applied hourly rates ranging from $413 per hour for

23

associates to $997 per hour for the founding partners.  (Doc. 55-6 at 2.)  In addition, Class Counsel

24

seek $225 per hour for all paralegals.  (*Id.*)  Class Counsel do not assert the requested rates are aligned

25

with the market rate in the Eastern District or provide any evidence concerning their hourly rates or

26

those of other attorneys in the community.[13]  (*See generally* Doc. 55-1; *see also id.* at 22 [identifying

27

28

[13] Class Counsel do not argue that counsel was unavailable in the Eastern Division, or that the Court should apply rates from other forums.

the lodestar total].)  Mr. Mallison simply asserts that "[t]he rates included are based on the current

Laffey Matrix."  (Doc. 55-2 at 17, ¶ 44.)

Significantly, however, the Eastern District "has repeatedly declined to adopt the Laffey

matrix, as it only surveys prevailing rates in the Washington, D.C. legal community and does not

directly correlate to hourly rates for attorneys and paralegals in other parts of the country."  *Cabardo v.*

*Patacsil*, 2022 WL 956951, at *3 (E.D. Cal. Mar. 29, 2022) (citations omitted); *see also Hassine v.*

*Johnson*, 53 F. Supp. 3d 1297, 1307 (E.D. Cal. 2014) (rejecting application of the Laffey Matrix

adjusted "to reflect the 'Los Angeles market rate'" because it was not the relevant legal community for

an action filed in the Eastern District, and there was "no evidence as to the prevailing market rate for

similar legal services in Fresno, California"); *Chapman v. Jacobs*, 2019 WL 4259765, at *4 (E.D. Cal.

Sept. 9, 2019) (declining to use the Laffey Matrix to determine a reasonable hourly rate because "it is

not an accurate tool to assess market rates in this district") *aff'd*, 836 Fed. App'x 606 (9th Cir. 2021).

Therefore, the Court declines to use the Laffey Matrix in this action, particularly where Class Counsel

have offered no evidence that the Laffey Matrix rates are aligned with the market rate in this form.

*See Blum*, 465 U.S. at 895 n.11; *Chaudhry*, 751 F.3d at 1110-11.

*a.*    *Attorneys*

Mr. Mallison reports that he began practicing law in 1996, and Hector Martinez was admitted to

the California Bar in 2000.[14]  (*Id.* at 6-7, ¶¶ 8-9.)  Several associates also worked on this action

including: Liliana Garcia, who was admitted to the California Bar in 2016; Juan Gamboa, who was

admitted to the California Bar in 2019; Daniel Keller, who was admitted to the California Bar in 2021;

Leanna Sac, who was admitted to the California Bar in November 2019; Heather Hamilton, who was

admitted to the California Bar in January 2021; and Gonzalo Quezada, who was admitted to the

California Bar in August 2021.[15]  (*Id.* at 7-9, ¶¶ 10-14.)  The hourly rates requested for these attorneys

---

[14] Mr. Mallison reported that Hector Martinez earned his law degree in 1998 and "worked at California Rural Legal Assistance, Inc." from 1999 to 2004.  (Doc. 55-2 at 7.)  With this limited information, it was unclear what year Mr. Martinez was admitted to practice law.  However, the Court "may take judicial notice of the State Bar of California's website regarding attorneys' dates of admission to the Bar." *Davis v. Hollins Law*, 25 F.Supp.3d 1292, 1298 n. 5 (E.D. Cal. 2014).  The California Bar website indicates Hector Martinez was admitted to practice in March 2000.  Thus, the Court takes judicial notice of this fact. *See id.*; Fed. R. Evid. 201(b).

[15] Mr. Mallison did not provide any information concerning when Leanna Sac, Heather Hamilton, and Gonzalo Quezada were admitted to practice.  (*See* Doc. 55-2 at 8, ¶ 13.)  According to the website of the State Bar of California, Ms. Sac was

1   exceed those typically awarded in the local forum.

2          The Court has performed a comprehensive survey of attorney fees awarded in the Eastern

3   District and finds current hourly rates range from $200 to $750, with hourly rates exceeding $600

4   reserved for attorneys who have been practicing approximately 30 years.  *See, e.g., Cianchetta v. BMW*

5   *of N. Am., LLC*, 2022 WL 2160556, at *6 (E.D. Cal. June 13, 2022) (reducing the hourly rate for

6   attorneys in their first year of practice to $200); *Seebach v. BMW of N. Am., LLC*, 2020 WL 4923664 at

7   *3 (E.D. Cal. Aug. 21, 2020) (awarding the hourly rates of $200 for an attorney who had been admitted

8   to practice less than two years, and $505 for an attorney "with roughly 20 years of experience" in

9   2020); *Siafarikas v. Mercedez- Benz USA, LLC*,  2022 WL 16926265, at *3 (E.D. Cal. Nov. 10, 2022)

10  (approving the hourly rate of $250 for an attorney "who has practiced law for three years" and $500 for

11  an attorney who had practiced law for 21 years); *Garybo v. Leonardo Bros*, 2021 WL 449350, at *5

12  (E.D. Cal. Sept. 30, 2021) (adopting the recommended hourly rate of $500 for attorneys who were

13  admitted to practice for 20 years or more, including Stan Mallison, to calculate a lodestar); *Mostajo v.*

14  *Nationwide Mut. Ins. Co.*, 2023 WL 2918657, at *11 (E.D. Cal. Apr. 12, 2023) (approving of "hourly

15  rates ranging from $650 through $750" for "attorneys with over thirty years of experience" for

16  purposes of calculating a lodestar); *Cooks v. TNG GP*, 2021 WL 5139613, at *6 (E.D. Cal. Nov. 4,

17  2021) (calculating the lodestar using the rate of $695 for attorneys with 30 years' experience).  With

18  these parameters in mind, the hourly rates for counsel must be adjusted to those of the local forum.

19         The rate for attorneys practicing law for 20 years or more—including Stan Mallison and Hector

20  Martinez—will be calculated at the rate of $525 per hour.  The rate for Liliana Garcia, who was

21  admitted to practice in 2016, will be adjusted to $300.  The rate for associates who had been practicing

22  law for approximately two years or less when working on the action—including John Gamboa, Daniel

23  Keller, Gonzalo Quezada, Heather Hamilton, and Leanna Sac— is adjusted to $200.[16]

24  ///

25

26

---

27  admitted to the bar in 2019; Ms. Hamilton was admitted in January 2021; and Mr. Quezada was admitted in August 2021. Therefore, judicial notice is taken of this information.  *See Davis,* 25 F.Supp.3d at 1298 n.5; Fed. R. Evid. 201(b).

28  [16] Juan Gamboa was admitted to practice in 2019, and last worked on the action in August 2021. (*See* Doc. 55-6 at 10-24.) Similarly, Leanna Sac was admitted to the bar in 2019, and all her reported work on this action was completed in the same calendar year.  (*See id.* at 52.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

b.      *Paralegals*

To calculate their lodestar, Class Counsel applied the hourly rate of $225 for each paralegal who performed work on this action, including: Cesar Juarez, Daniel Arjona, Logan Bowie, Rocio Espinoza, Michelle Pena, Paulina Maldonado, and Marbeya Garcia.  (Doc. 55-6 at 2.)  However, this amount exceeds the hourly rates for even the most experienced paralegals in the Eastern District.

Paralegal rates within the Eastern District range from $75 to approximately $150.00 per hour, depending on experience.  *See, e.g., Schmidt v. City of Modesto*, 2018 WL 6593362, at *6 (E.D. Cal. Dec. 14, 2018) ("the reasonable rate of compensation for a paralegal would be between $75.00 to $150.00 per hour depending on experience"); *Bernal v. Sacramento Cty. Sheriff Dep't,* 2023 WL 2504895, at *5 (E.D. Cal. Mar. 14, 2023) (rates of "approximately $100 per hour" were reasonable for paralegals in this district); *Gilbert v. Jabar Wireless Inc.*, 2023 WL 3055108, at *9 (E.D. Cal. Apr. 24, 2023) (finding the hourly rate of $115 was reasonable for "experienced paralegals"); *Block v. Narwal*, 2022 WL 17455502, at *9 (E.D. Cal. Dec. 6, 2022) (finding the requested rate of $115 was reasonable for paralegals who had more than ten years of experience); *Freshko Produce Servs. v. ILA Prods,* 2021 WL 4033176, at *4 (E.D. Cal. Sept. 2, 2021) (finding $150 per hour was reasonable "for a paralegal with more than 30 years of experience" for calculating a lodestar).

When parties fail to provide information related to the experience of paralegals, the Court has reduced the requested fee award to the lower end of the hourly rate range. *See, e.g., Englert v. City of Merced*, 2020 WL 2215749, at *13 (E.D. Cal. May 7, 2020) (rejecting the requested rates of $125 to $150 per hour for the paralegals and reducing them to $75 when the plaintiffs "provided no information on the experience of the paralegals"); *Freshko Produce Servs. v. Write on Mktg*., 2019 WL 3798491 at *3 (E.D. Cal. Aug. 13, 2019) (finding the proposed hourly rate of $150 was not reasonable because counsel "fail[ed] to identify the education and experience of [the] paralegal to justify the upper rate of $150," and adjusting the hourly rate to $100); *Mora v. Cal W. Ag Servs., Inc*., 2019 WL 2084725, at *9 (E.D. Cal. May 13, 2019) (applying adjusted rate for paralegals of $100 per hour where counsel failed to identify the experience of the paralegals).  Because Class Counsel failed to provide any information regarding the education and experience of any of the paralegals who worked on this action, the hourly rate for each paralegal will be reduced to $100.  *See Freshko Produce*, 2019 WL 3798491 at *3; *Mora*,

1  2019 WL 2084725, at *9.

2                      *c.     Law clerk*

3         In the lodestar summary, Class Counsel identified Lilianna Romero as a law clerk, and billed

4  her time at the rate of $225.  (Doc. 55-6 at 2.)  This rate is also higher than the prevailing market rate

5  for law clerks in the Eastern District.  *See, e.g., Mohamed v. Barr*, 562 F.Supp.3d 1128, 1135 (E.D.

6  Cal. 2022) (awarding the hourly rate of $125 for law clerks).  However, the Court notes that Ms.

7  Romero began working on the action in October 2021 and was admitted to the California Bar only

8  weeks later.[17]  (*See* Doc. 55-6 at 50-51.)  Furthermore, many of the tasks for which she billed occurred

9  after her admission date.  (*See id.*)  Accordingly, the Court will apply the same rate for Ms. Romero as

10  the other new attorneys and adjust her hourly rate to $200.

11            3.     Calculation and cross-check

12         Based upon the survey of fees awarded in the Eastern District and the Court's own knowledge,

13  the adjusted rates are reasonable and align with prevailing local market rates.  *See Cianchetta*, 2022

14  WL 2160556, at *6; *Garybo*, 2021 WL 449350, at *5; *see also Ingram v. Oroudjian,* 647 F.3d 925,

15  928 (9th Cir. 2011) (concluding "the district court did not abuse its discretion either by relying, in part,

16  on its own knowledge and experience" to determine reasonable hourly rates).  With the time and

17  hourly adjustments set forth above, the lodestar totals $112,990.00:

| Legal Professional | Time | Rate | Lodestar |
|---|---|---|---|
| Stan Mallison | 59.4 | $525 | $31,185.00 |
| Hector Martinez | 24.2 | $525 | $12,705.00 |
| Juan Gamboa | 234.6 | $200 | $46,920.00 |
| Daniel Keller | 20.2 | $200 | $4,040.00 |
| Gonzalo Quezada | 15.6 | $200 | $3,120.00 |
| Heather Hamilton | 3.5 | $200 | $700.00 |
| Liliana Garcia | 3.0 | $300 | $900.00 |
| Leanna Sac | 0.6 | $200 | $120.00 |
| Tania Fonesca | 0.0 | n/a | n/a |
| Natalia Ramirez Lee | 0.0 | n/a | n/a |
| Lilianna Romero | 33.7 | $200 | $6,740.00 |
| Cesar Juarez | 31.4 | $100 | $3,140.00 |
| Daniel Arjona | 11.6 | $100 | $1,160.00 |

---

[17] Mr. Mallison reports only that Ms. Romero is a former associate and was admitted to practice law.  (Doc. 55-2 at 8, Decl. ¶ 13.)  The website of the State Bar of California indicates Ms. Romero was admitted to the Bar on November 26, 2021. The Court takes judicial notice of her admission date. *See Davis,* 25 F.Supp.3d at 1298 n.5; Fed. R. Evid. 201(b).

| Logan Bowie | 7.6 | $100 | $760.00 |
|---|---|---|---|
| Rocio Espinoza | 6.7 | $100 | $670.00 |
| Michelle Pena | 6.0 | $100 | $600.00 |
| Paulina Maldonado | 1.9 | $100 | $190.00 |
| Marbeya Garcia | 0.4 | $100 | $40.00 |
| **Total** | | | **$112,990.00** |

Thus, the fees requested exceed the lodestar by more than $75,000.00 and fails to support the fees in the amount requested by Class Counsel.

### III.     Amount of Fees to be Awarded

As discussed above, Class Counsel faced few risks and did not face complicated factual issues in this action.  Indeed, new attorneys and paralegals were able complete the vast majority of the work. Class Counsel were not precluded from other work, and the short duration of the professional relationship also supports a downward adjustment from the benchmark.  Finally, the lodestar—which is a presumptively reasonable fee—also supports a downward adjustment.  *See Gonzalez*, 729 F.3d at 1202; *Camacho*, 523 F.3d at 978.

In light of the factors discussed above, a reduction to 20% of the common fund—a total of $120,000.00— is appropriate.  This percentage from the common fund remains within the range of acceptable fees in the Ninth Circuit.  *See Graulty*, 886 F.2d at 272 (fee awards from a common fund "[o]rdinarily … range from 20 percent to 30 percent of the fund created"); *Barbosa v. Cargill Meat Solutions Corp*., 297 F.R.D. 431, 448 (E.D. Cal. 2013) ("The typical range of acceptable attorneys' fees in the Ninth Circuit is 20 percent to 33.3 percent of the total settlement value"); *see also Six Mexican Workers*, 904 F.2d at 1311 (awarding "the 25 percent standard award" when "the litigation lasted more than 13 years, obtained substantial success, and involved complicated legal and factual issues").  The Court finds the modified amount is fair, reasonable, and adequate as required under Rule 23.  Class Counsels' request for fees is **GRANTED** in the modified amount of $120,000.00.

### REQUESTS FOR COSTS

### I.     Litigation Costs

"There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund." *Ontiveros v. Zamora*, 303 F.R.D. 356, 375 (E.D. Cal. 2014) (citation omitted).  Generally, reimbursement of taxable costs is

1   governed by 28 U.S.C. § 1920 and Federal Rule of Civil Procedure 54.  Attorneys may recover

2   reasonable expenses that would typically be billed to paying clients in non-contingency matters.  *See*

3   *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994).  In addition, costs may be awarded under

4   California law to an employee who prevails on a PAGA claim.  *See* Cal. Lab. Code § 2699(g).

5           Class Counsel indicated their costs were "estimated not to exceed $11,000," and the amount

6   was preliminarily approved.  (Doc. 50 at 6, n. 3; *see also id.* at 30.)  Class Counsel now request costs

7   in the amount of $10,537.33.  (Doc. 55-1 at 26.)  The itemized costs include fees for filing, mediation,

8   and the expert.  (Doc. 55-7 at 2.)  Previously, this Court observed that costs "including filing fees,

9   mediator fees …, and database expert fees … are routinely reimbursed" in class action cases.

10  *Alvarado v. Nederend*, 2011 WL 1883188 at *10 (E.D. Cal. Jan. May 17, 2011); *see also Ontiveros*,

11  303 F.R.D. at 375 (finding costs including mediation, court fees, research, and expert fees were

12  "reasonable litigation fees" and approving class counsel's request).  Because the costs are reasonable

13  and do not exceed the amount authorized, the request is **GRANTED** in the amount of **$10,537.33**.

14  **II.     Costs of Settlement Administration**

15          The parties agreed the Settlement Administrator shall "reasonable fees and expenses related to

16  administering this Settlement" from the gross settlement fund for its duties, including: "printing,

17  distributing, and tracking forms for this Settlement, calculating estimated amounts per Class Member,

18  tax reporting, distributing all payments from the Gross Settlement Amount (including conducting skip

19  trace address searches, as necessary), and providing necessary reports arid declarations."  (Doc 55-3 at

20  11, Settlement § III.B.4.)   Ms. Reyes reports that "Simpluris' total costs for services in connection

21  with the administration of this Settlement, including fees incurred and anticipated future costs for

22  completion of the administration, are $5,000.00."  (Doc. 55-9 at 5, Decl. ¶ 16.)  Plaintiff now seeks

23  approval of a payment of $5,000.00 for the Settlement Administrator.  (Doc. 55-1 at 28.)

24          Based upon the information provided regarding the tasks performed by the Settlement

25  Administrator— and the continuing responsibilities with the calculation of the settlement shares,

26  issuance and mailing of those settlement payments, and any necessary tax reporting on such

27  payments—the Court finds the requested Settlement Administration costs are reasonable.  Therefore,

28  the request for **$5,000.00** for the Settlement Administrator is **GRANTED**.

1

**CLASS REPRESENTATIVE PAYMENT**

2

A class representative may "receive a share of class recovery above and beyond [his] individual

3

claim" with a service payment, also known as an "incentive payment." *China Agritech, Inc. v. Resh*,

4

138 S.Ct. 1800, 1811 n.7 (2018); *see also Staton*, 327 F.3d at 977 ("named plaintiffs … are eligible for

5

reasonable incentive payments").  However, incentive payments for class representatives are *not* to be

6

given routinely.  The Ninth Circuit observed: "[i]f class representatives expect routinely to receive

7

special awards in addition to their share of the recovery, they may be tempted to accept suboptimal

8

settlements at the expense of the class members whose interests they are appointed to guard."  *Staton*,

9

327 F.3d at 975 (citations omitted).  Further, "'excessive payments to named class members can be an

10

indication that the agreement was reached through fraud or collusion.'"  *Id.* (citation omitted).

11

**I.      Awarding a Service Payment**

12

The Ninth Circuit has emphasized that "district courts must be vigilant in scrutinizing all

13

incentive awards." *Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157, 1165 (9th Cir. 2013).  In

14

evaluating a request for a service payment, the Court must consider: "'the actions the plaintiff has

15

taken to protect the interests of the class, the degree to which the class has benefitted from those

16

actions, the amount of time and effort the plaintiff expended in pursuing the litigation,' and any

17

financial or reputational risks the plaintiff faced." *Named Plaintiffs & Settlement Class Members v.*

18

*Feldman (In re Apple Inc. Device Performance Litig.)*, 50 F.4th 769, 786 (9th Cir. 2022) (quoting

19

*Roes, 1-2 v. SFBSC Mgmt., LLC,* 944 F.3d 1035, 1057 (9th Cir. 2019)); *see also Staton* 327 F.3d at

20

977.  Further, service payments may recognize a plaintiff's "willingness to act as a private attorney

21

general." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).

22

Pursuant to the agreement of the parties, Plaintiff may seek a "Class Representative Payment of

23

up to $10,000."  (Doc. 55-3 at 9, Settlement § III.B.1.)  The Settlement explains the enhancement is to

24

be given to Plaintiff "to compensate him for initiating the Lawsuit, performing work in support of the

25

Lawsuit, undertaking the risk of liability for attorneys' fees and expenses in the event he was

26

unsuccessful in the prosecution of the Lawsuit."  (*Id.* at 3, § I.K.)  The Court granted preliminary

27

approval of the request "given the flexibility for an award *up to* $10,000," but ordered: "**Plaintiff must**

28

**provide evidence supporting the requested enhancement**."  (Doc. 50 at 23, emphasis in original.)

Plaintiff now requests a service payment in the amount of $10,000.  (Doc. 55-1 at 26-28.)

### A.   Time expended

Plaintiff did not provide any estimate regarding the total time he spent on matters related to this action.  (*See generally* Doc. 55-8 at 3-4.)  However, Plaintiff reports that "[t]he attorneys at Mallison & Martinez have spent many hours over the course of [t]his litigation keeping me up to speed on the case and helping me with my responsibilities as class representative."  (Doc. 55-8 at 3-4, ¶ 4.)  The Court's review of the billing records indicates that Class Counsel and support staff billed approximately 15 hours for conversations with Plaintiff, from the initial intake through discussions about discovery and the settlement.  (*See, e.g.,* Doc. 55-6 at 2-4, 8, 10-13, 15, 17, 22-23, 25, 34-36, 47-48 and 50.)  The Court declines to speculate as to any additional time expended by Plaintiff on the matter, particularly given the failure to provide such evidence as previously ordered.  Nevertheless, the time indicated in the billing records supports issuing a service payment.

### B.   Actions taken to benefit the class

Mr. Mallison reports that Plaintiff "actively participated in the investigation of the issues in this case and the negotiations leading to the settlement of this matter."  (Doc. at 55-2 at 16, Mallison Decl. ¶ 40.)  Specifically, Plaintiff reports that he "(a) engaged in numerous periodic conferences with counsel; (b) participated in the litigation and provided input into the case; (c) was kept fully informed regarding the status of the case; and (d) provided significant input respecting litigation and settlement strategy."  (Doc. 55-8 at 3, Decl. ¶ 4)  Notably, Plaintiff likely would have taken many of these actions even if proceeding with individual claims.  On the other hand, by reviewing documents and assisting with discovery, his actions undoubtedly benefitted Class Members, who will receive an average payment of $2,203.95.  Therefore, the identified actions support a service payment for Plaintiff.

### C.   Workplace retaliation

The Court may consider whether the named plaintiff has "reasonable fears of workplace retaliation" in evaluating a request for a service payment.  *Staton*, 327 F.3d at 977.  However, this Court observed that when a class representative was a former employee—as here—retaliation by the defendant was not possible.  *See Torcia v. W.W. Grainger, Inc.*, 304 F.R.D. 256, 280 (E.D. Cal. 2014).  Because Plaintiff cannot suffer workplace retaliation from Defendant, this factor does not support a

1    service payment.

2        **D.    Reputational risk**

3        Plaintiff contends he "was concerned about future employers learning of [his] involvement" in

4    the action and "being branded a troublemaker."  (Doc. 55-8 at 4, ¶ 9.)  Notably, if Plaintiff elected file

5    his *individual* claims rather than a class action, his name also would have been on the complaint as the

6    plaintiff.  Regardless, any difficulty obtaining future employment due to Plaintiff's status as a named

7    plaintiff lacks evidentiary support and is speculative.  The Ninth Circuit observed: "the trial court is not

8    bound to, and should not, accept conclusory statements about 'potential stigma' and 'potential risk,' in

9    the absence of supporting evidence."  *See Wilson v. Telsa, Inc.*, 833 Fed. App'x 59, 62 (9th Cir. 2020)

10   (quoting *Clark v. Am. Residential Servs. LLC*, 175 Cal. App. 4th 785, 805 (2009)).  Thus, the Ninth

11   Circuit determined a court did not abuse its discretion in reducing a requested class representative

12   payment from $10,000 to $5,000 based on the speculative "risk of reputational injury."  *Id.*  This factor

13   does not support the requested service payment for Plaintiff.

14       **E.    Financial risk**

15       Plaintiff observes that he "undertook the financial risk that, in the event of a judgment in favor

16   of Defendant in this action, [he] could have been personally responsible for any costs awarded in favor

17   of the Defendant."  (Doc. 55-1 at 28.)  Courts in the Ninth Circuit have repeatedly acknowledged such

18   a financial risk supports an incentive payment to a class representative.  *See, e.g., Vasquez,* 266 F.R.D.

19   at 491 ("Class Representatives undertook the financial risk that, in the event of a judgment in favor of

20   Defendant in this action, they could have been personally responsible for any costs awarded in favor of

21   Defendant"); *Wilson v. Metals USA, Inc.*, 2021 WL 516585, at *9 (E.D. Cal. Feb. 11, 2021) (noting

22   the plaintiffs asserted that "by initiating this case, they assumed the risk of a judgment against them

23   and personal liability for an award of costs to defendant in the event of an adverse outcome, and

24   finding the identified financial risk "weighs in favor of granting an incentive award"); *Jones v.*

25   *Abercrombie & Fitch Trading Co*., 2018 U.S. Dist. LEXIS 198001, at *26 (C.D. Cal. Nov. 19, 2018)

26   (considering the named plaintiffs "assumed financial risk for paying costs if the case had been lost" in

27   awarding service payments); *Pierce v. Rosetta Stone, Ltd.*, 2013 WL 5402120, at *7 (N.D. Cal. Sept.

28   26, 2013) (considering that the class representatives "may have been personally responsible for any

costs awarded in favor of Defendant").  Therefore, this factor supports a service payment for Plaintiff.

### F.    Willingness to act as private attorney general

Incentive payments may recognize a named plaintiff's "willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958-59.  Here, Plaintiff acted as a private attorney general, which will result in payments to the LWDA and aggrieved employees under PAGA.  (*See* Doc. 55-3 at 10, Settlement § III.B.3) Accordingly, this factor supports a service payment for the class representative.

## II.    Reasonableness of Plaintiff's request

Considering the factors set forth above—including the actions taken by Plaintiff on behalf of the class, the time expended, benefit received, financial risk, and willingness to serve as a private attorney general—an incentive award is appropriate.  To determine the amount to be awarded, the Court may consider the actions undertaken by the class representative, the fairness of the hourly rate, and how large the incentive award is compared to the average award class members expect to receive.  *See, e.g., Ontiveros v. Zamora*, 303 F.R.D 356, 366 (E.D. Cal. Oct. 8, 2014) (evaluating the hourly rate the named plaintiff would receive to determine whether the incentive award was appropriate); *Rankin v. Am. Greetings, Inc.*, 2011 WL 13239039, at *2 (E.D. Cal. July 6, 2011) (noting the incentive award requested was "reasonably close to the average per class member amount to be received); *Alvarado*, 2011 WL 1883188 at *10-11 (considering the time and financial risk undertaken by the plaintiff).  Notably, a service payment of $5,000 for the class representative "is presumptively reasonable" in the Ninth Circuit.  *Richardson v. THD At-Home Servs.*, 2016 WL 1366952, at *13 (E.D. Cal. Apr. 6, 2016); *see also Bellignhausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015) (observing that in the Northern District, "a $5,000 payment is presumptively reasonable").

### A.    Actions of the class representative

In *Alvarado*, the Court noted the class representatives "(1) travelled from Bakersfield to Sacramento for mediation sessions (2) assisted Counsel in investigating and substantiating the claims alleged in this action; (3) assisted in the preparation of the complaint in this action; (4) produced evidentiary documents to Counsel; and (5) assisted in the settlement of this litigation." *Id.*, 2011 WL 1883188 at *11.  Also, the Court noted the plaintiffs "undertook the financial risk that, in the event of a judgment in favor of Defendant in this action, they could have been personally responsible for the costs

awarded in favor of the Defendant." *Id.*  In light of these facts, the Court found an award of $7,500 for each plaintiff was appropriate for the time, efforts, and risks undertaken.

Likewise, in *Bond*, the Court found incentive payments of $7,500 were appropriate for the two named plaintiffs who: "(1) provided significant assistance to Class Counsel; (2) endured lengthy interviews; (3) provided written declarations; (4) searched for and produced relevant documents; (5) and prepared and evaluated the case for mediation, which was a full day session requiring very careful consideration, evaluation and approval of the terms of the Settlement Agreement on behalf of the Class." *Bond*, 2011 WL 2648879, at *15.  Similarly, the Northern District determined class representatives failed to justify incentive awards of $10,000 although the plaintiffs reported "they were involved with the case by interacting with counsel, participating in conferences, reviewing documents, and attending the day-long mediation that resulted in the settlement." *Wade v. Minatta Transport Co.*, 2012 U.S. Dist. LEXIS 12057, at *3 (N.D. Cal. Feb. 1, 2012).

Although Plaintiff was not required to attend a mediation session, it appears his remaining actions are comparable to the plaintiffs in *Alvarado*, *Bond*, and *Wade*.  Despite being required to spend less time on this matter, Plaintiff seeks a service payment that is greater than service payments those class representatives.  Accordingly, this factor does not support a conclusion that the service payment requested by Plaintiff is fair or reasonable.

### B.    Fairness of the hourly rate

Previously, courts have considered the hourly rate of compensation for a class representative. *See, e.g., Ontiveros*, 303 F.R.D. at 366; *Moss v. USF Reddaway*, 2018 WL 5099291, at *11 (C.D. Cal. Feb. 15, 2018); *Pappas v. Naked Juice Co of Glendora, Inc.*, 2014 WL 12382279, at *14-15 (C.D. Cal. Jan. 2, 2014). In doing so, the courts declined to issue service awards where the hourly rate for the tasks completed in the action was excessive or unreasonable.  *See, Ontiveros*, 303 F.R.D. at 366; *Moss*, 2018 WL 5099291, at *11; *see also Pappas, Inc.*, 2014 WL 12382279, at *14-15.

For example, this Court criticized a requested award because the award would have compensated the class representative "at a rate of $73.80 per hour." *Ontiveros*, 303 F.R.D. at 366. In evaluating the reasonableness of the award, the Court noted Ontiveros was paid $15 per hour while employed by the defendant.  *Id.* at 366, n.3.  The Court explained that "[i]ncentive awards should be

sufficient to compensate class representatives to make up for financial risk … for example, for time they could have spent at their jobs." *Id.* at 366 (citing *Rodriguez*, 563 F.3d at 958-59.  The Court found an award of "$50 per hour fairly compensate[] the named plaintiff for his time," and rounded the $13,500 total up to $15,000 to "incorporate[] an extra incentive to participate in litigation."  *Id.*

Similarly, the Central District declined to approve service payments to the class representatives where the proposed amount resulted in "extremely high hourly rates."  *Moss*, 2018 WL 5099291, at *11.  The court observed the requested award of $25,000 for each of the class representatives, Moss and Watkins, was "the equivalent of a payment of approximately $210 per hour Moss and $470 per hour Watkins."  *Moss*, 2018 WL 5099291, at *11.  Therefore, the court reduced the proposed award to $14,000 to each class representative.  *Id.*

Plaintiff has not provided any information regarding the pay he received as an employee of Defendant.  (*See generally* Doc. 55-8 at 3-4.)  The requested service payment to Plaintiff—based upon the estimated 15 hours that he spent assisting Class Counsel on the matter—would result in an hourly rate of more than $650, which is clearly excessive.  *See Ontiveros*, 303 F.R.D. at 366;  *Moss*, 2018 WL 5099291, at *11; *see also Pappas, Inc.*, 2014 WL 12382279, at *14-15 (reducing the service awards to $58 per hour for each class representative).  If the Court were to adopt the $50 hourly rate approved in *Ontiveros*, the service award would be reduced to $750.  Thus, this factor does not support a service payment in the amount requested.

### C.   Comparison of the award to those of the Class Members

The Ninth Circuit indicated the Court may consider the "proportion of the [representative] payment[s] relative to the settlement amount, and the size of each payment."  *In re Online DVD-Rental Antitrust Litig.,* 779 F.3d 934, 947 (9th Cir. 2015); *see also Spann v. J.C. Penney Corp.,* 211 F. Supp. 3d 1244, 1265 (C.D. Cal. 2016).  For example, in *Rankin*, the Court approved a service award of $5,000, where the "[p]laintiff retained counsel, assisted in the litigation, and was an active participant in the full-day mediation."  *Id.*, 2011 WL 13239039, at *2.  The Court found the amount reasonable, observing it was "reasonably close to the average per class member amount to be received."  *Id.*

The requested award for Plaintiff is approximately 4.5 times the average award of $2,203.95 for the Class Members.  In addition, the requested award is approximately 1.66% of the gross settlement

fund, which appears unreasonable in this action.  *Compare with In re Online DVD-Rental Antitrust Litig.,* 779 F.3d 934, 947 (9th Cir. 2015) (awarding $5,000 as a service payment, which was 0.17% of the gross settlement fund); *Spann,* 211 F.Supp.3d at 1265 (awarding a class representative payment of $10,000, which was less than 0.25 percent of the gross settlement).  Given the disparity between the average award and Plaintiff's requested service payment—as well as the percentage of the settlement fund— this factor favors a reduction to the service award.

### III.    Amount Awarded

A "substantial effort" by a plaintiff is necessary to support a service payment of $10,000.  *See Coburn v. City of Sacramento,* 2020 WL 7425345, at *8 (E.D. Cal. Dec. 17, 2020); *see also Amaro v. Gerawan Farming Inc*., 2020 WL 6043936, at *10 (E.D. Cal. Oct. 12, 2020) (awarding a payment of $10,000 to plaintiffs who spent over 370 hours each during the course of the litigation on tasks such as "talking to co-workers, assisting class counsel, attending the mediation, and organizing class members to keep them apprised of the status of [the] case"); *Valentine v. Rehab. Ctr. of Santa Monica Holding Co. GP, LLC,* 2021 U.S. Dist. LEXIS 243660, at *13-14 (C.D. Cal. Dec. 20, 2021) (finding the class representative failed to justify a service enhancement of $10,000, though the plaintiff reported 59.5 hours on the litigation, during which she "was deposed, worked closely with [class] counsel, assisted in the preparation of pleadings, provided factual information and assisted in identifying potential witnesses").

Because the factors discussed above support an incentive award— and the actions of Plaintiff clearly benefited Class Members—a service payment is appropriate.  However, the amount requested is excessive.  As noted above, the application of a $50 hourly rate to the 15 hours in evidence before the Court would result in an award of $750.  On the other hand, Plaintiff released all potential claims related to his employment with Defendant.  (*See* Doc. 55-3 at 20-21, Settlement § III.G.)  This Court indicated that a plaintiff sacrificing "the opportunity to bring several of his own claims" supported an increase to a service payment, even if "unclear whether those claims would have had merit." *Ontiveros*, 303 F.R.D. at 366.  Thus, a moderate increase to the award is appropriate.  *See id.*

A service payment of $2,500 for Plaintiff is reasonable in light of the time expended, tasks taken, benefit to the class, and the sacrifice of his own claim.  *See Ontiveros*, 303 F.R.D. at 366; *see*

1  *also Flores v. ADT LLC*, 2018 WL 6981043 (E.D. Cal. Mar. 19, 2018) (awarding a service payment of

2  $5,000 to a plaintiff who "contributed between 50 and 55 hours in assisting in the prosecution"); *see*

3  *also Tellez v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 2020 WL 619588 *8 (S.D. Cal. Feb. 10, 2020)

4  (declining to award incentive payments in the requested amount of $5,000; and awarding $2,000 to a

5  class representative who "estimate[d] she spent over 20 hours assisting counsel" and $1,000 to the

6  representatives who did not provide an estimate of the time spent on the action). This amount is nearly

7  equal to the average payment and is approximately 0.47% of the gross settlement fund, which is a more

8  reasonable total than the amount requested. The Court finds the modified payment is fair, reasonable,

9  and adequate as required under Rule 23. Therefore, Plaintiff's request for a service payment as class

10  representative is **GRANTED** in the modified amount of **$2,500.00.**

11  **CONCLUSION AND ORDER**

12  Based upon the foregoing, the Court finds the "Amended Settlement Agreement and Release"

13  is fair, adequate, and reasonable. The factors set forth under Rule 23 and Ninth Circuit precedent

14  weigh in favor of final approval of the settlement agreement. Accordingly, the Court **ORDERS**:

15  1.  Plaintiff's motion for final approval of the Settlement (Doc. 55) is **GRANTED**.

16  2.  Certification of the Settlement Class is **GRANTED**, and the class is defined as follows:

17
18  > Any individual who worked for Semi-Tropic in the State of California as an hourly paid, non-exempt employee at any time between November 5, 2015 and June 3, 2021.

19  3.  Pursuant to his request, Edgar Villela Lizorraga is **EXCLUDED** from the Settlement

20  Class.

21  4.  The PAGA award in the amount of $**50,000.00** from the Gross Settlement Amount,

22  including payment of $37,500.00 to California's Labor and Workforce Development

23  Agency and $12,500.00 to aggrieved employees, is **APPROVED**.

24  5.  The request for a class representative service payment for Plaintiff is **GRANTED** in the

25  amount of $**2,500.00**.

26  6.  Class Counsel's motion for fees is **GRANTED** in the modified amount of 20 percent of

27  the gross settlement fund, which totals **$120,000.00**.

28  7.  Class Counsel's request for litigation costs is **GRANTED** in the amount of $**10,527.33**.

8.    Settlement Administration costs in the amount of **$5,000.00**, to be paid from the gross settlement fund, are **APPROVED**.

9.    The action is **DISMISSED** with prejudice, with each side to bear its own costs and attorneys' fees except as otherwise provided by the Settlement and ordered by the Court.

10.   The Clerk of Court is **DIRECTED** to close this action.

11.   The Court retains jurisdiction to consider any further applications arising out of or in connection with the Settlement.

IT IS SO ORDERED.

Dated:    **May 19, 2023**

UNITED STATES DISTRICT JUDGE